Vicky CHAO, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Jan. 7, 1992.
Decided: Jan. 29, 1992.

Joseph A. Hurley, Wilmington, for appellant.

Gary A. Myers, Deputy Atty. Gen., Dept. of Justice, Georgetown, for appellee.

Before CHRISTIE, C.J., HORSEY, MOORE, WALSH, and HOLLAND, JJ.

CHRISTIE, Chief Justice:

Following a jury trial in the Superior Court, in and for New Castle County, the defendant/appellant, Vicky Chao ("Chao"), was convicted of six counts of murder in the first degree, 11 *Del.C.* §§ 636(a)(1), 636(a)(2); one count of attempted murder in the first degree, 11 *Del.C.* § 531; one count of arson in the first degree, 11 *Del.C.* § 803(2); one count of burglary in the first degree, 11 *Del.C.* § 826; two counts of conspiracy in the first degree, 11 *Del.C.* § 513; and one count of conspiracy in the second degree, 11 *Del.C.* § 512. On May

25, 1990 the Superior Court sentenced Chao to seven consecutive terms of life imprisonment to be served without benefit of probation or parole or any other reduction, 11 Del.C. § 4209, and fifteen years' imprisonment.

In this appeal Chao raises five issues arguing that her convictions should be reversed. First, she contends that the trial court abused its discretion when it failed to grant her motion to suppress four separate statements she made during questioning on March 10, 1989. Appellant specifically alleges that her Fifth Amendment rights were violated because she was not given *Miranda* warnings prior to what she characterized as custodial interrogation. Second, appellant contends that the trial court's failure to instruct the jury as to the lesser included offenses of intentional murder and felony murder constitutes reversible error. Third, appellant contends that the trial court abused its discretion in sentencing her to six life terms on the basis of convictions of both intentional murder, 11 Del.C. § 636(a)(1), and felony murder, 11 Del.C. § 636(a)(2) for each of three victims. Fourth, appellant contends that the trial court committed plain error in failing *sua sponte* to appoint an interpreter for the appellant at the suppression hearing, a critical phase of the trial. Finally, appellant also contends that there was insufficient evidence to establish her guilt of intentional murder and felony murder beyond a reasonable doubt.

We have reviewed each of Chao's contentions and find them to be without merit. Therefore, the judgment of Superior Court, which resulted in Chao's convictions and sentences, is affirmed.

*Facts*

In the early morning hours of March 9, 1988 three members of William Chen's ("Chen") family were killed in a fire that was deliberately set at his Claymont home. It appears that sometime after 4 a.m. Chen and his wife were sleeping in their second floor bedroom when they were awakened by a loud noise and smoke. According to his testimony, upon waking, Chen went downstairs to investigate what was happening whereupon he saw the stooped-over figure of a female intruder amidst the first floor smoke. In an attempt to summon help and to rid his home of the smoke, Chen opened the front door. Upon doing so, however, flames flashed through the house quickly engulfing it and forcing Chen outside. Fire fighters later found the burned remains of his wife, mother, and daughter in the upstairs bedrooms.

Within an hour after the fire was reported, deputy state fire marshals began to arrive at the scene and an investigation ensued. According to expert testimony offered at trial, the investigation revealed that gasoline had been poured in three separate areas of the house: (i) in the garage below Chen's bedroom, (ii) around a back door, and (iii) throughout the first floor living area including the foyer, the living room, the dining room, and the stairs leading to the second floor. The evidence further showed that a very intense, fast-burning fire was started in each of the three areas and that the rear entrance was the principal ignition point. As a result, the investigators concluded that the entire first floor was instantaneously engulfed by a "fireball". Moreover, given the strategic placement of the gasoline, investigators also concluded that the fires had been specifically set so as to deny the occupants of the house a route of escape.

Pursuant to a joint investigation by the Delaware Attorney General's Office, New Castle County Police, and the Fire Marshal's Office which had already begun, investigators interviewed Chen on three separate occasions on the day of the conflagration. During the interview Chen revealed that he had been involved in a turbulent relationship with a woman from New York City. Identifying the woman as Vicky Chao, he further advised the investigators of various problems he had been having with her. Specifically, Chen recounted an incident in which Chao had him arrested for assaulting her approximately one month prior to the fire. Moreover, Chen also indicated that as early as nine days before the fire, Chao had been to his Claymont home causing a disturbance. In particular, he

claimed that she became embroiled in an argument with both his wife and mother and that she threatened to cause "big trouble" if he didn't "throw his family away" and marry her instead.

William Chen immigrated to the United States with his mother in 1978 from the People's Republic of China. Although he and his mother first settled in Delaware, Chen moved to New York City the following year to attend college. It was there that he met Vicky Chao in 1979 and became involved in a romantic relationship with her. Although they never actually lived together, Chen eventually gave Chao the keys to his apartment and the two grew close, often spending a great amount of time together. In fact, at one point in their relationship Chao provided Chen with four thousand dollars enabling him to open his own business. Then, in 1985, their relationship was dramatically transformed when Chen traveled to China to marry his now deceased wife, Jing Hong. Upon returning from China with his wife, the couple settled in the Claymont home which was consumed in the March 9th fire.

Armed with the information obtained in their interviews with Chen and considering him to be a suspect, investigators immediately traveled to New York City to question Chao. The Delaware contingent, consisting of two detectives, a State fire marshal, and a deputy attorney general, arrived at New York's 115th Precinct in the early morning hours of March 10. Four New York City police officers joined the team from Delaware, and the contingent went to Chao's apartment at about 1:45 a.m.[1] Identifying themselves as investigating an incident, one of the detectives asked Chao if she would accompany them back to the station to answer some questions. Chao agreed to accompany the officers. Then she got dressed and they drove her to the 115th Precinct. Chao was not handcuffed nor was she arrested or told that she was under arrest. On the contrary, she was simply assisting the investigators

in their effort to solve a serious crime which had been apparently committed by an individual she knew.

Upon arriving at the station house, Chao and the Delaware investigators went into a large assembly room at approximately 2:30 a.m. An officer then explained to Chao that they were there investigating an arson-murder in Delaware and that they wished to ask her some questions about the incident. A female New York City police officer was present at the time and told Chao that she did not have to speak to the Delaware law enforcement personnel and that she was free to leave. Chao, however, chose to stay. The investigators then spoke with Chao for one hour and fifteen minutes. Approximately 45 minutes into this period a New York desk sergeant entered the room, and Chao was again told that she was not under arrest and that she was free to leave. Nevertheless, Chao responded that she wished to stay. In fact, on several occasions throughout the interview, different law enforcement personnel repeatedly told Chao that she was free to go. She, however, consistently chose not to exercise that right.

As the interview progressed, the deputy attorney general who sat in on the questioning eventually came to the conclusion that Chao had information concerning the fire but was hesitant to reveal it. To make some headway, the lawyer asked the officers to leave the room so that he could talk to Chao "one-to-one." This occurred at about 3:30 a.m. After the others left, he explained to Chao that this was only an investigation and that if she had done nothing wrong, she would have nothing to fear in talking to him. During this time Chao freely moved about the large assembly room and repeatedly asked "will he ever get out." Ultimately, Chao agreed to tell the investigators what she knew. The other officers subsequently returned whereupon Chao gave a tape-recorded statement.

---

1. While investigators were traveling to Delaware Chen gave a fourth statement to New Castle County Police at approximately 11:23 p.m. on March 9th. In that statement he advised the police that he owed Chao $5,000 and that she had previously threatened to burn down his house.

The police did not preface any of their questioning with *Miranda* warnings.

In her statement, Chao implicated an individual named Liu as the arsonist. According to her testimony, she and Chen were mutual acquaintances of Liu. More importantly, however, she explained to investigators that Liu wanted to kill Chen and that he forced her to accompany him to Delaware the previous night in his yellow taxicab. She further stated that while traveling to Delaware Liu stopped and filled a plastic container with gasoline. She then claimed that when they arrived at Chen's home she was terrified and waited in the taxi after Liu exited it because he had threatened her. Chao further stated that when Liu eventually returned to the taxi, his hand was bleeding and he exclaimed that he had set fire to the house.

Eager to further the investigation, and follow up on the information Chao provided, the Delaware authorities promptly ended their questioning of her and hastened to find Liu. Before doing so, however, the investigators asked Chao to assist them in locating Liu. She declined the request and was subsequently left in the precinct's public lobby free to go. At that time she was still not a suspect. Nevertheless, Chao chose to remain in the lobby throughout the night despite the fact that her apartment was only five blocks away. In fact, she never requested that she be taken home, and she made no effort to obtain transportation. By 11 o'clock that morning, however, investigators obtained and pieced together enough information to implicate Chao in the crime along with Liu. She was thereafter arrested.

At trial the prosecution rebutted Chao's account of her victimized bystander role in the arson-murder with evidence portraying her as a vengeful woman scorned. The prosecution argued that Chao had become distraught over Chen's refusal to leave his family and jealous of the life he made for himself in Delaware. Consequently, the State argued that she acted upon those emotions by soliciting Liu, another suitor, to help her seek retribution against Chen. In compliance with defense counsel's wishes, the trial judge did not instruct the jury as to the lesser included offenses of the crimes charged. Rejecting Chao's portrayal of herself as an innocent victim, the jury subsequently convicted Chao of each count in the indictment.

### Miranda

Chao first contends that the trial court abused its discretion when it did not grant her motion to suppress incriminating statements she made to the police on March 10, 1989. We find this contention to be without merit. Inexorably intertwined in the process of in-custody interrogation are "inherently compelling pressures which undermine [an] individual's will to resist— and compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694, 719 (1966). Consequently, in the case of *Miranda v. Arizona* the United States Supreme Court held that statements obtained during custodial interrogation are inadmissible absent a prior warning advising a suspect of his or her Fifth Amendment right to remain silent, among others. *Id.* Further delineating the parameters within which *Miranda* warnings are triggered, the Court explained that "[b]y custodial interrogation [it meant] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise *deprived of his freedom of action in any significant way.*" 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706 (emphasis added). In other words, either (i) a formal arrest or (ii) a restraint on freedom of movement rising to the degree associated with formal arrest involves the *Miranda* ruling. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977); *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275, 1279 (1983) (per curiam). Thus, in the absence of an actual arrest the critical variable in defining "custody" is the extent to which a particular detention resembles an actual arrest.

In analyzing and applying *Miranda,* therefore, it is necessary to address

custody and the coercive environment with which custody is associated, as two fundamentally distinct concepts. Custody conceptually involves the deprivation of a person's freedom. The coercive environment which results is simply the by-product of that deprivation. Similarly, the creation of a coercive environment is not limited to or unique to custodial settings such as an arrest. Rather, a coercive environment can arise in any number of situations associated with everyday life. In other words, a coercive environment can exist outside of custody. In view of the distinction between custody and a coercive environment it should be noted that noncustodial situations involving criminal investigations are not automatically converted into situations as to which *Miranda* applies simply because questioning takes place in a coercive environment. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977) (per curiam). Such a broad construction of *Miranda* and the Fifth Amendment is not required by law. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Id.* Thus, the fact that questioning takes place in a coercive environment does not in itself trigger *Miranda.* Regardless of the environment, custody or its equivalent is always required before *Miranda* will apply. *Id.* (*Miranda* warnings are only required when a person's freedom has been sufficiently restricted so as to amount to custody).

In the present case, while it appears that Chao may have been interviewed in what could have been perceived as a coercive environment, *Miranda* does not apply because the questioning was noncustodial. As the facts indicate, Chao was neither formally arrested nor deprived of her freedom in any significant way before, during,

or immediately after she was questioned by investigators in the early morning hours of March 10th. Chao's encounter with the police began at approximately 1:45 a.m. when eight investigators appeared at her apartment and asked her to assist them in an investigation of a serious crime. She agreed to cooperate and after getting dressed, she accompanied the officers to the police station to answer their questions.[2] Subsequent to arriving at the police station and throughout the interview, the surrounding circumstances militate against a finding that Chao was in custody. The fact that the questioning occurred in a police station does not necessitate a finding of custody since the objective circumstances do not suggest that Chao was held against her will. *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam) (*Miranda* warnings do not have to be imposed simply because questioning takes place in the station house or because the person being questioned is a suspect); *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (if a suspect is not placed under arrest, voluntarily comes to the police station and is allowed to leave unhindered by the police after a brief interview, in this case no more than 30 minutes, *Miranda* is not triggered). On several occasions throughout the interview which lasted more than one hour, different law enforcement personnel told Chao that she was free to leave. Thus, although the interview was not as brief as the thirty-minute questioning session upon which the ruling in *California v. Beheler* was based, Chao's interview was neither excessive in length nor custodial in nature. *See id. See also Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (questioning took place within a 30–minute time period). In view of the fact that the interview was repeatedly interrupted to advise Chao that she could leave at anytime, the interview was essentially segmented into shorter ses-

---

**2.** It should be noted that later that morning Chao refused a direct police request that she accompany and assist them in their effort to locate Liu, the man she implicated. That refusal was made in a police-dominated environ-

ment, the 115th precinct, and just after she had been questioned for more than an hour. Thus, from Chao's perspective, it appears that she believed she was not compelled to cooperate.

sions, each commencing and terminating with a renewed opportunity for Chao to end the questioning and return home. Moreover, Chao was not restrained in any way. At all times she was free to move throughout the assembly room where she was questioned. Additionally, in line with what the police had consistently told her, upon completing the interview they left her in the public lobby free to go. There is little more the police could have done to assure Chao that she was not under arrest and was free to leave. Finally, it is important to note that while Chao was still inside the "coercive environment" of the 115th Precinct after the interview, she refused a direct request by the police to help them locate Liu. Consequently, given the circumstances in this case, Chao is not to be regarded as being in custody during the March 10th interview and *Miranda* does not apply.

### *Jury Instructions*

#### 1. State Law

■ Appellant next contends that the trial court committed reversible error by not *sua sponte* instructing the jury as to the lesser included offenses to intentional murder and felony murder. The contention is made in spite of the facts that (a) instructions to the jury on lesser included offenses were waived by appellant when his attorney stated "... we're not requesting any lesser included offenses," (b) no objection was made to the omission of such instructions, and (c) no request for such instructions were ever made. Still appellant claims that such instructions are required under both Delaware law, 11 *Del.C.* § 206(c), and the United States Constitution as applied in the cases of *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) and *Schad v. Arizona,* —— U.S. ——, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) and that it was plain error not to give them.

The Court finds these arguments to be without merit under the circumstances of this case.

■ A trial court is not required to instruct a jury with respect to lesser included offenses "unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of the included offense [instead]." 11 *Del.C.* § 206(c). In fact, unless a party objects to a jury instruction before or immediately after a jury retires to consider its verdict, that party may not later claim that any portion or omission from the charge is an error. Superior Court Criminal Rule 30. In other words, if a party fails to raise a timely objection to jury instructions, he or she risks losing the right to complain on appeal. *Turner v. State,* Del.Supr., 137 A.2d 395, 398 (1958) (a defendant who did not object to the charge given the jury and who did not request permission to assign such charge as error was barred from raising the issue on appeal); *Lane v. State,* Del.Supr., 222 A.2d 263, 268 (1966) (defendant who did not submit a request for a more detailed charge and who did not object to the instruction at trial was not permitted to do so on appeal); *Flamer v. State,* Del.Supr., 227 A.2d 123, 128 (1967) (defendant was not permitted to object to jury instructions on appeal when he did not do so at trial). *See also Matthews v. State,* Del.Supr., 310 A.2d 645 (1973). Consequently, it is clear that absent a finding of plain error, a trial court has no *sua sponte* duty to provide instruction as to lesser included offenses under state law.[3]

■ Neighboring states have resolved this issue similarly. For example, in the case of *State v. Choice,* the New Jersey Supreme Court held that a trial court does not have to meticulously sift through an entire court record to ascertain whether

---

**3.** Failure to object to jury instructions pursuant to Superior Court Criminal Rule 30 will not always preclude a party from raising the issue on appeal. In the case of *Wiggins v. State,* the jury instruction error was considered to be so basic and fundamental that it should have been noticed by the Court even in the absence of an

adequate objection. *Wiggins v. State,* Del.Supr., 210 A.2d 314, 316 (1965). *Zimmerman v. State,* Del.Supr., 565 A.2d 887 (1989) (a trial court must give instructions as required by the evidence and the law whether requested or not by the parties).

some combination of facts and inferences might support a manslaughter charge where the parties did not request such a charge and the facts do not clearly indicate that the crime was manslaughter. *State v. Choice*, 98 N.J. 295, 486 A.2d 833 (1985). More recently, the Maryland Supreme Court held that a court should not give jury instructions on an uncharged lesser included offense where neither side requested or affirmatively agreed to the instruction. *Hagans v. State*, 316 Md. 429, 559 A.2d 792 (1989). Similar decisions have been reached in such states as Connecticut, the District of Columbia, Maine, and Pennsylvania. *State v. Jacobowitz*, 194 Conn. 408, 480 A.2d 557 (1984) (defendant charged with criminal attempt to commit murder was not entitled to have trial judge instruct jury on lesser included offenses, where defendant failed to request such a charge); *Jackson v. United States*, D.C.App., 377 A.2d 1151 (1977) (trial court did not err in failing to *sua sponte* instruct, in a prosecution for assault with a dangerous weapon and burglary in the second degree, on lesser included offenses of simple assault, carrying a dangerous weapon, and unlawful entry); *Commonwealth v. Johnson*, 460 Pa. 493, 333 A.2d 881 (1975) (in murder trial, trial court did not commit error by failing to charge on voluntary manslaughter, where defendant did not request such a charge and did not note a specific exception when the trial court failed to so charge); *State v. Hilliker*, Me.Supr., 327 A.2d 860 (1974) (even though defendant, charged with felonious homicide punishable as murder, would have been entitled to instruction on involuntary manslaughter, failure to so instruct did not result in manifest injustice, where there was no request and defendant failed to present any evidence from which the jury could have found that the killing was unintentional). The courts in Delaware and in other states properly place the burden of requesting lesser included offenses in jury instructions upon defense counsel for it is they who determine trial tactics and presumably act in accordance with a formulated strategy.[4]

### 2. Constitutional Law

■ Appellant's contention that the United States Constitution imposes a *sua sponte* duty upon trial courts to instruct juries on lesser included offenses is also without merit. *Kubat v. Thieret*, 867 F.2d 351 (7th Cir.1989) (defendant was not entitled to *sua sponte* jury instruction on lesser included offenses of aggravated kidnapping since his attorney did not request the instructions for fear that they would have impaired the alibi defense); *Look v. Amaral*, 725 F.2d 4 (1st Cir.1984) (state trial court in a murder prosecution was not required to charge the jury on lesser included offenses, although not statutorily prohibited, because the defense waived the inclusion of such offenses in the instructions).

In the case of *Beck v. Alabama*, the petitioner was convicted of robbery or attempts thereof when the victim is intentionally killed by the defendant and was sentenced to death. *Beck*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Under the Alabama law in effect at that time, felony murder was considered to be a lesser included offense to the capital murder crime of which Beck was found guilty. Nevertheless, the trial court did not include the lesser included offense in its charge to the jury. Rather, since Alabama's death penalty statute prohibited judges from giving juries the option of convicting a defendant of a lesser included offense in capital murder cases, the jury was only instructed

---

**4.** In *Walker v. United States*, 418 F.2d 1116, 1119 (D.C.Cir.1969), the court provided that:
> [a] trial judge should withhold charging on lesser included offense unless one of the parties requests it, since that charge is not inevitably required ... [and] ... is an issue best resolved, in our adversary system, by permitting counsel to decide on tactics.

Similarly, the Maryland Court of Appeals has also held that:
> [a] trial court ordinarily should not give a jury an instruction on an uncharged lesser included offense where neither side requests or affirmatively agrees to such instruction ... [as these are matters of] strategy which are best left to the parties.

*Hagans v. State*, 316 Md. 429, 559 A.2d 792, 804 (1989).

as to the capital offense.[5] Consequently, the jury's only option was to convict Beck of a capital offense thereby sentencing him to death or to acquit him thereby setting him free. *Id.* Beck appealed his conviction claiming that the prohibition on giving lesser included offense instructions in capital cases substantially increases the risk of error in the fact-finding process in violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.

In evaluating the Alabama statute, the United States Supreme Court noted that while it has "never held that a defendant is entitled to a lesser included offense instruction as a matter of due process" the rule is almost universally accepted in the state and federal courts. *Beck*, 447 U.S. at 637, 100 S.Ct. at 2389, 65 L.Ed.2d at 402. By according defendants the procedural safeguard of providing jurors with the additional option of convicting a person of a lesser included offense, the defendant is more likely to receive the full benefit of the reasonable doubt standard. *Beck*, 447 U.S. at 634, 100 S.Ct. at 2388, 65 L.Ed.2d at 400. In other words, by limiting a jury's choice of convicting or acquitting a defendant of the charged offense alone, jurors who have determined that a serious crime was committed may convict a person simply because they believe he or she deserves to be punished, although not necessarily for the crime with which the defendant was charged. The third option of convicting on a lesser included offense reduces the risk of unwarranted convictions. With respect to Beck, the Court stated that the death penalty must be imposed on the basis of "reason rather than caprice or emotion." *Beck*, 447 U.S. at 638, 100 S.Ct. at 2390, 65 L.Ed.2d at 403. Furthermore, the Court held that a sentence of death may not be constitutionally imposed when the jury was not permitted to consider a verdict of guilt on a non-capital lesser included offense,

and the evidence would have supported such a verdict. *Beck*, 447 U.S. at 643–46, 100 S.Ct. at 2392–94, 65 L.Ed.2d at 406–08.

Similarly, in the case of *Schad v. Arizona*, the United States Supreme Court recently addressed the same issue. *Schad*, — U.S. ——, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). In that case the defendant was indicted for first degree murder and at his retrial,[6] the prosecution argued for both premeditated and felony murder. The defense, however, claimed that the evidence, at best, only proved that he was a thief. Consequently, before the court charged the jury, the defense requested an instruction on theft as a lesser included offense. The court rejected the request and instructed the jury on first and second degree murder instead. After being convicted of first-degree murder and sentenced to death, the defendant appealed claiming that he was entitled to the theft instruction under *Beck*.

The United States Supreme Court rejected Schad's contention and affirmed his conviction stating that the defendant misunderstood the conceptual underpinnings of *Beck*. In *Beck*, the Court's fundamental concern "was that a jury convinced that the defendant had committed *some* violent crime, but not convinced that she was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." *Schad*, — U.S. at ——, 111 S.Ct. at 2504 (emphasis added). The jury that determined Schad's guilt or innocence, however, was not faced with an all-or-nothing decision. On the contrary, they were provided with a third option, convicting him of second degree murder. Consequently, the jury instructions did not pose a danger to the reliability of the fact-finding process. *Beck*, therefore, does not stand for the proposition that the jury in a capital case must as a matter of constitutional law be instructed as to every

---

**5.** Alabama Code § 13–11–2(a) (1975) provided that:

If the jury finds the defendant guilty, it shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation, which must also be averred in the indictment, and which

offenses so charged with said aggravation shall not include any lesser offenses.

**6.** Schad was convicted and sentenced to death, however, his conviction was set aside on collateral review.

non-capital lesser included offense that is supported in the evidence. *Id.* Rather, the case simply mandates that juries be furnished with a "third option" so as to safeguard the reliability of the fact finding process.

In the present appeal, Chao similarly misunderstands the conceptual underpinnings of both the *Beck* case and the *Schad* case. The instructions with which appellant's jury was charged contained a multitude of diverse counts including murder in the first degree, attempted murder in the first degree, arson in the first degree, conspiracy in the first degree, conspiracy in the second degree, and burglary in the first degree. In view of the wide variety of options available to the jury in this case, an all-or-nothing choice between a capital murder conviction and innocence was not present and the constitutional issue discussed in the *Beck* case does not exist in this case. Thus, the appellant's contention is without merit.

### *Sentencing*

 In addition to being convicted of three counts of first degree intentional murder, Chao was also convicted of three counts of first degree felony murder (by recklessly causing the deaths of the same three victims during the commission of an arson) and was sentenced to six life terms of imprisonment, based on the killing of three victims. Chao contends that her six separate life sentences, arising from only three homicides, violates constitutional pro-

hibitions against double jeopardy.[7] This Court finds Chao's claim to be without merit.

The Double Jeopardy Clause [8] guarantees three protections. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *State v. Cook*, Del.Supr., 600 A.2d 352 (1991) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656, 664–65 (1969)). Chao contends that her six separate life sentences for the death of only three victims violates the latter prohibition against multiple punishments for the same offense.

The United States Supreme Court has held that, for purposes of double jeopardy, the term "punishment" encompasses a criminal conviction and *not* simply the imposition of a sentence. *Ball v. United States*, 470 U.S. 856, 861, 105 S.Ct. 1668, 1671, 84 L.Ed.2d 740, 745–46 (1985). Therefore, although Chao has framed her argument in terms of whether her multiple *sentences* for felony murder and intentional murder are a violation of the double jeopardy prohibition against multiple punishments, the question underlying Chao's claim is whether her multiple *convictions* for murder in the first degree, arising from the death of a single person, are constitutionally permissible. That question has been repeatedly answered by this Court in the affirmative.[9] *See, e.g., Flamer v.*

---

**7.** Although Chao, in her opening brief, characterizes the Superior's Court sentencing decision as an abuse of discretion, the substance of her supplemental briefs and oral arguments allege that the Superior Court's sentence violates constitutional principles of double jeopardy. *See* U.S. Const. amend. V; Del. Const. art. I, § 8. Constitutional claims are reviewed by this Court *de novo* to determine if the Superior Court committed an error of law.

**8.** The double jeopardy language of the Delaware Constitution is similar to the federal provision. *White v. State*, Del.Supr., 576 A.2d 1322, 1324 n. 3 (1990). *See* Del. Const. art. I, § 8. This Court has not yet been required to determine whether the federal and state double jeopardy provisions are identical in scope in all respects. *White v. State*, 576 A.2d at 1324 n. 3. We are not re-

quired to make that determination in this case either. Therefore, this opinion will refer to double jeopardy provisions in both the federal and state provisions as the Double Jeopardy Clause. *Id.*

**9.** *See, e.g., Flamer v. State*, Del.Supr., 490 A.2d 104, 118 (1984) (defendant could be charged and convicted on one count of intentional murder and a second count of felony murder for killing only one person and was sentenced for both charges; *Rush v. State*, Del.Supr., 491 A.2d 439 (1985) (trial court did not abuse its discretion when it failed to require the State to elect between the charges of first degree murder involving intentional killing and first degree murder involving reckless killing committed during the course of a felony); *Deputy v. State*, Del. Supr., 500 A.2d 581 (1985) (reversals of defen-

*State,* Del.Supr., 490 A.2d 104, 118 (1984); *Rush v. State,* Del.Supr., 491 A.2d 439 (1985); *Deputy v. State,* Del.Supr., 500 A.2d 581 (1985); and *Conlow v. State,* Del. Supr., 441 A.2d 638 (1982).

█ Principles of double jeopardy do not prohibit multiple punishments for two offenses arising out of the same occurrence if each offense requires proof of a fact which the other does not. *LeCompte v. State,* Del.Supr., 516 A.2d 898, 900 (1986) (citing *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932)). If each offense requires proof of a fact which the other does not, then the two offenses are not the "same" for double jeopardy purposes. *Id.* In *Flamer,* this Court held that felony murder and intentional murder are *not* the same offense, and, thus, a criminal defendant may be permissibly charged and convicted of both crimes for the death of a single person. *Flamer v. State,* 490 A.2d at 118.

In *Flamer,* this Court examined the language of both the intentional murder and felony murder provisions of the Delaware Code, which provide that "[a] person is guilty of murder in the first degree when: (1) he *intentionally* causes the death of another person [and/or]; (2) in the course of and in furtherance of the commission of a felony or immediate flight therefrom, he *recklessly* causes the death of another person." 11 *Del.C.* § 636(a)(1)–(2). The Court concluded that, if *mens rea* was the sole element to consider, the two crimes would

merge into the crime with the higher mental state, intentional murder. In the final analysis, however, the *Flamer* Court concluded that mental state is not the sole consideration; the additional "factor that elevates a reckless killing, under § 636(a)(2) to an equal plane with subsection (a)(1) is the added element not required for subsection (a)(1), that the killing occur 'in the course of and in furtherance of the commission of a felony or immediate flight therefrom.'" *Flamer v. State,* 490 A.2d at 118.

█ Consequently, because felony murder and intentional murder are not the same offense as a matter of Delaware law, separate convictions and separate sentences are permissible. *See id. See also Dawson v. State,* Del.Supr., 581 A.2d 1078, 1109 (1990) (affirming separate convictions and sentences for intentional murder and felony murder arising from a single homicide.) *Compare State v. Schad,* 163 Ariz. 411, 417, 788 P.2d 1162, 1168 (1989) (holding "In Arizona, first degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder."), *aff'd,* —— U.S. ——, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). We, therefore, conclude that Chao's double jeopardy challenge to the imposition of multiple punishments (separate convictions and sentences) for intentional murder and felony murder, that arise from a single homicide, is without merit.[10]

---

dant's convictions for intentional murder rendered moot and without merit on the issue of whether convicting the defendant on four counts of murder in the first degree when there were only two victims); *Conlow v. State,* Del. Supr., 441 A.2d 638 (1982) (trial court did not err as a matter of law or abuse its discretion in not requiring the State to elect between first degree intentional murder and first degree felony murder before trial).

**10.** Chao also argues that, notwithstanding a finding by this Court that separate convictions and sentences for intentional murder and felony murder are constitutionally permissible, this Court should nevertheless adopt a permutation of the rules followed in other jurisdictions that would combine her separate consecutive life sentences for intentional murder and felony murder, arising from a single person's death, into a single sentence. *See State v. Chicano,* 216

Conn. 699, 584 A.2d 425 (1990); *State v. Allard,* Me.Supr., 557 A.2d 960 (1989). We find no merit to this argument. Chao's separate convictions and life sentences are constitutionally permissible. Although those sentences have been imposed consecutively, consecutive sentences under these circumstances are academic. By their very nature, true life sentences without probation or parole, irrespective of the number imposed upon a defendant, or their appellation as consecutive or concurrent, can be fully served only once. Similarly, a death sentence can be executed only once irrespective of the number imposed upon a defendant. Under such circumstances we do not perceive any cognizable distinction or detriment to the defendant by reason of the conviction and sentencing scheme intended by the General Assembly. Indeed, counsel could point to none either in briefing or at oral argument. Multiple convic-

**1362**

### Interpreter

■ Chao contends that the trial court committed plain error in failing *sua sponte* to appoint an interpreter for her at her suppression hearing. The Court finds no merit in this contention.

■ A criminal defendant who is unable to understand the English language is effectively denied the right to consult with an attorney, to confront his or her accusers, and/or to waive constitutional rights knowingly, intelligently, and voluntarily. *United States v. Cirrincione*, 780 F.2d 620, 633 (7th Cir.1985). Given the importance of affording foreign language defendants the capacity to understand and appreciate the criminal proceedings to which they are subject, the United States Court of Appeals for the Seventh Circuit established a four-prong test to determine when an official interpreter is needed to safeguard such a defendant's right to due process. *Id.* at 634. That court ruled that a defendant is denied due process when: (1) what is told him is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the proceeding is not explained to him in a manner designed to insure his full comprehension; or (4) a credible claim of incapacity to understand due to language difficulty is made and the district court fails to review the evidence and make appropriate findings of fact.

*Id.* Under such an approach when a trial court is put on notice that an indigent defendant may have obvious and significant difficulty with the language, that defendant has the right to a court-appointed interpreter. *Luna v. Black*, 772 F.2d 448, 451 (8th Cir.1985) (per curiam). However, if an interpreter was not requested and the record indicates that the defendant did not have trouble communicating, a court's failure to appoint an interpreter is not plain error. *See id. See also Hrubec v. United States*, 734 F.Supp. 60 (E.D.N.Y.1990) (the fact that a defendant's primary language is not English does not *ipso facto* create a duty to inquire of the need for an interpreter absent a lack of comprehension).

In the present case the court's failure to *sua sponte* appoint an interpreter for Chao has not been shown to be plain error. Throughout the suppression hearing neither Chao nor her attorney ever indicated that they were unable to communicate with each other or that Chao was having any difficulty in understanding English. On the contrary, the record clearly indicates that Chao was able to understand and effectively interact in the English language. First, during Chao's initial interviews with investigators, she told them that she taught English in China prior to coming to the United States in 1973. Second, during the trial, Chao indicated that she understood all of the English speaking witnesses, the prosecutor's opening remarks, and English in general. In fact, during the penalty hearing, Chao interrupted the prosecutor's summation to twice call him a "liar" in English. Third, on several occasions during her trial, Chao objected to various translations made by the court interpreter who was translating for Chinese-speaking witnesses. Specifically, she complained that the interpreter neither accurately translated the English questions into Chinese nor correctly interpreted her own answers, given in Chinese, into English. Finally, during her redirect examination, Chao read portions of the English transcript of her earlier statement and responded to defense counsel's questions, in English without going through an interpreter. *See Tran v. Lockhart*, 849 F.2d 1064, 1068 (8th Cir.1988).

### Sufficiency of Evidence

#### 1. Felony Murder

■ Appellant contends that there was insufficient evidence to establish her guilt of felony murder beyond a reasonable doubt. Specifically, appellant claims that since all of the prosecution's evidence indicates that she intended to kill the Chens by

tions and consecutive sentences for a single killing do serve a practical end, however, since they assure service of one life sentence in the event one of the multiple convictions is later invalidated.

setting their house on fire, no rational juror could infer that the killings were caused "in furtherance of the commission" of arson, a felony. Rather, she asserts that the evidence points towards arson as being the instrumentality or means by which the intentional murders were accomplished. Based upon the internal structure of Delaware's first and second degree murder statutes, 11 *Del.C.* §§ 636, 635, respectively, appellant's argument is found to be without merit.

■ The provisions of 11 *Del.C.* §§ 636(a)(6) and 635(2) both impose murder liability when a person "with criminal negligence, causes the death of another person" "[i]n the course of and in furtherance of the commission ... of any [enumerated] felony." However, the culpability of "criminal negligence" is not consistent with furthering the commission of a felony because criminal negligence means that the actor did not perceive the risk that death would result from his or her conduct. 11 *Del.C.* § 231(d). In other words, a person can either cause another's death out of criminal negligence *or* in furtherance of a felony, but not both simultaneously. The killing is either negligent or it is not. This contradiction in language demonstrates that the inclusion of the phrase "in furtherance" as used throughout §§ 636 and 635 was not meant to require that the killing be committed as an incident to an underlying felony. On the contrary, for felony murder liability to attach, a killing need only accompany the commission of an underlying felony. Thus, if the "in furtherance" language has any limiting effect, it is solely to require that the killing be done by the felon, him or herself. *See Weick v. State,* Del.Supr., 420 A.2d 159, 161 (1980). Consequently, since a rational jury could conclude from the evidence that the three deaths occurred during the commission of the arson, the evidence was sufficient to impose liability on the appellant. § 636(a)(2).

### 2. Intentional Murder

■ Appellant additionally contends that her first degree intentional murder convictions are not supported by sufficient evidence either. In support of this conten-

tion, she argues that the "mortar" of the State's case against her consisted of (i) her romantic involvement with Chen and (ii) her desire for him to leave his family to be with her. Furthermore, she also claims that Chen's testimony must be discounted on the grounds that it was so contradictory and inconsistent that no rational jury could have relied upon it. Nevertheless, the fact that the jury did find her guilty cannot be discounted.

"Once a defendant has been found guilty of the crime[s] charged, the fact-finding role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) (emphasis supplied). This rule reflects the fundamental tenet of American jurisprudence that the jury is the sole trier of fact responsible for determining witness credibility, resolving conflicts in testimony and for drawing any inferences from the proven facts. *Pryor v. State,* Del.Supr., 453 A.2d 98, 100 (1982) (the jury is the sole judge of a witness' credibility and is responsible for resolving conflicts in testimony), *State v. Matushefske,* Del.Super., 215 A.2d 443, 446 (1965) (determination of true facts and the drawing of any inferences from the proven facts are matters solely within the jury's province), *State v. Winsett,* Del.Super., 205 A.2d 510, 521 (1964) (the degree of credit to be given to the evidence of a participant or accomplice is a matter exclusively within the province of the jury). Even if a witness' testimony was "evasive, conflicting or severely impaired," the jury has a right to believe as much of it as they believe proper. *United States v. Luciano,* 343 F.2d 172, 173 (4th Cir.), *cert. denied,* 381 U.S. 945, 85 S.Ct. 1792, 14 L.Ed.2d 708 (1965). Since appellant has not indicated anything so absurd as to vitiate Chen's testimony as beyond reason, the evidence was sufficient to support each of the verdicts.

AFFIRMED.