# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. No. 1503016361 |
| | ) | |
| JOSHUA SCRUGGS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: January 15, 2016
Date Decided: January 22, 2016

*Upon Defendant's Motion to Suppress Custodial Statement*:  **DENIED.**

Periann Doko, Deputy Attorney General, Julie Finocchiaro, Deputy Attorney General,  Delaware Department of Justice, 820 North French Street, Wilmington, DE 19801, Attorneys for the State.

Patrick J. Collins, Esquire, Colleen E. Durkin, Esquire, Collins & Associates, 716 North Tatnall Street, Suite 300, Wilmington, DE 19801, Attorney for Defendant.


**JURDEN, P.J.**

# I. INTRODUCTION

Before the Court is Defendant Joshua Scruggs's Motion to Suppress Custodial Statement. The Court held a suppression hearing on January 15, 2016, and has reviewed the briefs submitted by the parties and the videotaped interview at issue. For the reasons set forth below, Defendant's Motion to Suppress Custodial Statement is **DENIED.**

# II. BACKGROUND

On March 22, 2015, officers from the New Castle County Police Department ("NCCPD") were called to a shooting at Rogers Manor Park in New Castle, Delaware. On arrival, officers found Miguel Escobar and Jose Padilla-Gonzales in a GMC Sierra suffering from gunshot wounds. Escobar and Padilla were immediately transported to the hospital. A third occupant of the vehicle, Axel Cruz, was transported to the NCCPD headquarters.

The initial police investigation revealed that Brandon Kasinath was meeting Escobar to consummate a marijuana sale. Kasinath and another male allegedly got into the Sierra and pulled out a handgun. At the same time, two other men allegedly stood outside of the Sierra with shotguns. Someone then fired shots into the Sierra, injuring Escobar and Padilla.

As the investigation progressed, the police learned that Kasinath and several other individuals met earlier that day at 136 Stamm Boulevard, the home of Carlos

Hernandez, where they allegedly passed around two shotguns and a handgun, and planned to rob Escobar.

On March 25, 2015, three days after the shooting, Detective John Ziemba, the Chief Investigating Officer, asked Detective Sendek and Detective DiSabatino of the NCCPD to locate Defendant Joshua Scruggs ("Scruggs") and ask Scruggs if he would be willing to come to the NCCPD police headquarters for a formal interview with Detective Ziemba. Although Scruggs was not considered a suspect at the time, Detective Ziemba had information that Scruggs was at 136 Stamm Boulevard on the day of the shooting, and he wanted to talk to Scruggs about who else was there and what Scruggs heard or observed.

The officers went to Scruggs's house and made the request. The officers also told Scruggs that if he wished he could drive himself, but Scruggs elected to accompany the officers in an unmarked police car. Detective Sendek testified that if Scruggs had indicated that he did not want to go to police headquarters, the officers would have left.

Detective Sendek testified that he was not certain if Scruggs was patted down for weapons, but it is his standard practice to conduct a safety pat down for weapons before anyone is transported in his police car. Detective Sendek's police car did not have a shield or barrier between the driver and passenger compartments.

Upon arriving at the NCCPD headquarters around 9:20 a.m., Scruggs followed Detective DiSabatino through the main lobby entrance. According to Detective Sendek, individuals who are suspects or in custody are escorted through an entrance in the back of the building, which leads directly to the processing and cell block area. Scruggs was not handcuffed and remained in possession of all of his belongings.

Scruggs followed Detective DiSabatino to an interview room where he was left alone for about fifteen minutes until Detective Ziemba commenced the interview at approximately 9:39 a.m.. After obtaining Scruggs's background information, Detective Ziemba began to question Scruggs about his whereabouts on March 22, 2015, and the various people he was with that day.

Approximately one hour into the interview, Detective Ziemba administered *Miranda* warnings, and Scruggs signed a *Miranda* waiver form. The interview continued for approximately three more hours, during which time Scruggs admitted that guns were present at Carlos' house. Scruggs also told Detective Ziemba who had the guns, how the robbery was planned, and who was present during the shooting.

Scruggs was arrested later that day, along with co-defendants Hernandez, Kasinath, Kaleef Smyre, and Jorge Reza-Ayala. Scruggs was charged with Attempted Murder First Degree, Robbery First Degree, Assault Second Degree,

4

Conspiracy First Degree, Conspiracy Second Degree, twelve counts of Possession of a Firearm During the Commission of a Felony, and Criminal Mischief.

## III. PARTIES' CONTENTIONS

Scruggs moves to suppress his entire March 25, 2015 statement, arguing that it was obtained in violation of the Fifth Amendment of the United States Constitution. Scruggs argues that he was interrogated for over an hour and provided incriminating information before being advised of his *Miranda* rights. Scruggs contends that under *Missouri v. Seibert*[1] and *State v. Mattison*,[2] the mid-interrogation *Miranda* warning is unconstitutional and cannot cure the statement he gave pre-*Miranda*. In response, the State argues that Scruggs was never subject to a custodial interrogation and that *Seibert* and *Mattison* are not applicable because Detective Ziemba did not use the two-tiered interrogation scheme at issue in those cases.

## IV. DISCUSSION

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, the United States Supreme Court extended the right against self-incrimination to any person suspected of a crime who is subjected to custodial

---

[1] *Missouri v. Seibert*, 542 U.S. 600 (2004).
[2] *State v. Mattison*, 2005 WL 406342 (Del. Super. 2005).

interrogation.[3]

A law enforcement officer's obligation to administer *Miranda* warnings attaches only in the context of a "custodial interrogation."[4]   A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[5]  The Court must review the totality of the circumstances, and the "initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."[6]

The fact that the questioning occurs in a police station does not automatically make it custodial.[7]   "[T]he legal standard used to determine 'custody' for *Miranda* purposes is whether there was a formal arrest or restraint on

---

[3]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] *Marine v. State*, 607 A.2d 1185, 1191–92 (Del. 1992).

[5] *Miranda*, 384 U.S. at 444.

[6] *Stansbury v. California*, 511 U.S. 318, 323 (1994).

[7]  *Oregon v. Mathiason*, 429 U.S. 492, 492–95 (1977) ("[A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'  Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question.  Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.  Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'  It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited."); *Chao v. State*, 604 A.2d 1351, 1355–56 (Del. 1992) overruled on other grounds by *Williams v. State*, 818 A.2d 906 (Del. 2002).

freedom of movement of the degree associated with a formal arrest."[8]  "In the absence of a formal arrest, the determination that there has been a restraint on freedom of movement to a degree that would trigger *Miranda* turns on whether a reasonable person, in the suspect's position, would believe himself or herself to be in custody or deprived of his or her freedom in a significant way."[9]

Under the totality of the circumstances, the Court finds that Scruggs was not in custody prior to the time when Detective Ziemba administered *Miranda* warnings.  Scruggs voluntarily came to the police headquarters and knew he was going there for an interview with Detective Ziemba.  Although Scruggs was transported in an unmarked police car, Scruggs was told that if he wished he could drive himself.  Scruggs voluntarily elected to accompany the officers in the police car.[10]

---

[8] *Schellinger v. State*, 2000 WL 1587950, at *1 (Del. 2000) (citing *Stansbury*, 511 U.S. at 1528–29); *Marine*, 607 A.2d at 1192.

[9] *State v. Wright*, 2009 WL 3068914, at *4 (Del. Super. 2009); *Chao*, 604 A.2d at 1355 ("[I]n the absence of an actual arrest the critical variable in defining 'custody' is the extent to which a particular detention resembles an actual arrest.").

[10] *California v. Beheler*, 463 U.S. 1121 (1983) (holding *Miranda* warnings were not required where the defendant, although a suspect, was not placed under arrest, voluntarily came to police station, and was allowed to leave unhindered after brief interview); *Chao*, 604 A.2d at 1356–57 (holding that the defendant was not subject to custodial interrogation even though the defendant was escorted from her home to the police station); *State v. Davis*, 2002 WL 1463105, at *2 (Del. Super. 2002) (holding that the defendant was not subject to custodial interrogation when he accompanied the police officers to the police station, was not told he was under arrest, was not handcuffed, was given breaks when requested, and was allowed to return home when he wanted); *Wright*, 2009 WL 3068914, at *4–5 (holding that the defendant was not in custody when the defendant voluntarily accompanied officers back to the police station, was patted down for weapons, was never handcuffed, remained in possession of his cell phone, and the interview door was not locked); *State v. Sumner*, 2003 WL 21963008, at *11 (Del. Super. 2003) (holding

Upon arriving at the NCCPD headquarters, Scruggs followed Detective DiSabatino through the main lobby entrance and was left alone in the interview room until Detective Ziemba commenced the interview. Scruggs was not handcuffed, deprived of his belongings, or processed in any way that would lead a reasonable person in that situation to believe that he or she was in custody or otherwise deprived of his or her freedom of action in any significant way. The interview door was not locked, Scruggs was not restrained, and Scruggs did not ask to leave or indicate that he wanted to leave. Detective Ziemba was the only officer present for the entire interview, the tone of the interview was conversational, and the pre-*Miranda* portion of the interview was only an hour long with two breaks, during which Scruggs was left alone in the interview room.

Several times during the interview Detective Ziemba told Scruggs that he knew he was lying and advised Scruggs about the importance of being truthful. For example, Detective Ziemba told Scruggs, "if you keep lying you will be in worse trouble," "help yourself out, it's every man for himself," and "you could get arrested for lying to me." Scruggs argues that no reasonable person subject to this aggressive line of questioning would feel free to leave.

---

that the defendant was not in custody when the defendant voluntarily agreed to accompany officers to the police station, was patted down for weapons, was never handcuffed, did not ask to leave, and the interview door was not locked).

8

"When there is no formal arrest, another aspect of the inquiry is whether the police resorted to psychological pressure or deception sufficient to transform an interview into a custodial interrogation."[11] However, "police tactics which can be described as 'coercive' do not of themselves change the nature of an interview."[12] "*Miranda* warnings are only required when a person's freedom has been sufficiently restricted so as to amount to custody."[13]

Under the totality of the circumstances surrounding the interview, after reviewing the testimony provided at the suppression hearing, and the videotaped interview, the Court does not find that Detective Ziemba's line of questioning, wherein he accused Scruggs of lying, transformed the interview into a custodial interrogation such that a reasonable person, in Scruggs's position, would believe he was in custody or deprived of his freedom in a significant way. Although Scruggs was not overly forthcoming, he remained calm, did not appear frustrated, did not indicate that he wanted the questioning to end, or that he wanted to leave. Both Detective Ziemba and Scruggs's tone and demeanor remained conversational, Detective Ziemba remained seated, Scruggs was not restrained in any way, and Scruggs was left alone in the interview room during two breaks.[14]

---

[11] *State v. Aiken*, 1992 WL 301739, at *2 (Del. Super. 1992); *State v. Alexander*, 1994 WL 150862, at *4–6 (Del. Super. 1994).
[12] *Id.* (citing *Mathiason*, 429 U.S. at 495).
[13] *Chao*, 604 A.2d at 1356 (citing *Mathiason*, 429 U.S. at 495).
[14] *Mathiason*, 429 U.S. at 495–96 ("The officer's false statement about having discovered [the defendant's] fingerprints at the scene . . . has nothing to do with whether [the defendant] was in

Scruggs relies on *Seibert* and *Mattison* to argue that the mid-interrogation *Miranda* warning cannot cure the statement he gave pre-*Miranda*. However, both *Seibert* and *Mattison* are distinguishable from the present case. In *Seibert*, the interrogating officer intentionally withheld *Miranda* warnings as an interrogation technique until the defendant gave a confession.[15] The interrogating officer then elicited a subsequent confession following the *Miranda* warnings.[16] The United States Supreme Court held that this two-tiered interrogation scheme was unconstitutional and provided the following factors in considering whether mid-stream interrogation *Miranda* warnings would be effective: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first."[17]

Similarly, in *Mattison*, the issue before the Court was whether a mid-interrogation *Miranda* warning could cure a prior confession given without proper *Miranda* warnings. In *Mattison*, the defendant was taken into custody following a

custody for purposes of the Miranda rule."); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("Instead of pressuring Alvarado with the threat of arrest and prosecution, she appealed to his interest in telling the truth and being helpful to a police officer."); *United States v. LeBrun*, 363 F.3d 715, 721 (8th Cir. 2004) ("[T]he coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart.").

[15] *Seibert*, 542 U.S. at 605–06.
[16] *Id.*
[17] *Id.* at 615–16.

traffic stop and was questioned in an interrogation room about his alcohol and drug consumption prior to that traffic stop.[18] Mattison responded that he had been drinking, had consumed three bags of heroin, and "that he committed crimes to get the drugs."[19] The interrogating officer then issued *Miranda* warnings and questioned Mattison regarding these newly discovered crimes.[20] Applying the *Seibert* factors, the Court concluded that the mid-interrogation *Miranda* warnings could not cure Mattison's first statement, and reasoned that, "the post-*Miranda* warnings [could not] function effectively because the second confession was not separate and distinct from the first line of questioning."[21]

In the present case, Scruggs was not subject to a custodial interrogation prior to being advised of his *Miranda* rights, and Detective Ziemba did not use a two-tiered interrogation approach to elicit an incriminating response before Scruggs was advised of his *Miranda* rights. Detective Ziemba had reason to believe that Scruggs was at Carlos' house the day of the shooting and Detective Ziemba's pre-*Miranda* questions focused on what happened at Carlos' house and the people who were there. Detective Ziemba administered *Miranda* warnings once Scruggs positively identified Brandon Kasinath, an individual suspected to be involved in the shooting. After Scruggs signed a *Miranda* waiver form, Detective Ziemba

---

[18] *Mattison*, 2005 WL 406342, at * 1.
[19] *Id.*
[20] *Id.*
[21] *Id.* at *3.

11

began asking questions about firearms at Carlos' house, the robbery, and the shooting.

## V. CONCLUSION

Based on the totality of the circumstances, Scruggs was not in custody prior to being advised of his *Miranda* rights and, therefore, the interrogating officer was not required to administer *Miranda* warnings. Scruggs was not formally arrested and there was no restraint on Scruggs's freedom of movement to a degree that would lead a reasonable person, in Scruggs's position, to believe he was in custody or deprived of his freedom in any significant way. For the foregoing reasons, Defendant's Motion to Suppress Custodial Statement is **DENIED.**

**IT IS SO ORDERED.**

_____

Jan R. Jurden, President Judge