**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert Leslie DUNSON and James Edward Marks, Defendants-Appellants.**

**No. 90-6061.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 14, 1991.

Decided Aug. 1, 1991.

**990**

James E. Arehart, Asst. U.S. Atty., Louis DeFalaise, U.S. Atty., Robert F. Trevey, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Lexington, Ky., for plaintiff-appellee.

Aubrey Williams (argued), Louisville, Ky., for defendants-appellants.

Before NELSON and SUHRHEINRICH, Circuit Judges, and WELLFORD, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This is an appeal by two defendants who pleaded guilty to a federal charge of possession of seven kilograms of cocaine with intent to distribute it. The cocaine was discovered during an ostensibly consensual search of an automobile that had been stopped for speeding by a police officer assigned to a drug interdiction unit. The main issue—preserved for appeal by the entry of conditional guilty pleas under Rule 11(a)(2), Fed.R.Crim.P.—is whether the officer's conduct violated the Fourth Amendment's prohibition against unreasonable searches and seizures. One of the defendants, who was sentenced to a statutorily-mandated 20-year prison term, also contends that his sentence constituted cruel and unusual punishment contrary to the Eighth Amendment.

After a brief preliminary examination and a much longer evidentiary hearing on a motion by the defendants to suppress the fruits of the search, a United States magistrate made comprehensive factual findings that were accepted by the district judge. The court found, among other things, that the driver of the automobile committed a traffic violation for which the officer was entitled to stop him; that the stop was made because of the traffic violation; and that the driver voluntarily consented to a search of his car, doing so "intelligently and without duress or coercion." Given these findings, which are not clearly erroneous, we conclude that the convictions must be affirmed. We shall also affirm the challenged sentence.

## I

It is not uncommon, as we know, for illegal drugs to enter this country through southern states—Florida and Georgia, *e.g.*—and then move to markets in northern states such as Ohio and Michigan. One of the routes used in this traffic is Interstate Highway 75, which connects Florida and Georgia with every state in the Sixth Circuit.

The evidence presented in the case at bar showed that the Division of Police of Lexington–Fayette Urban County, Kentucky, maintained a specially-trained criminal patrol unit that "worked" Interstate 75 on a regular basis. Applying techniques taught during in-service training they received from the Institute of Police Training and Management at Jacksonville, Florida, officers assigned to the criminal patrol unit practiced what one of them described as "strict enforcement of traffic laws," stopping as many motorists as possible for speeding and other traffic violations. Once a motorist had been stopped, the officer would examine his license and automobile registration, run a computer check to see if the individual was wanted by law enforcement authorities, and attempt to engage the driver and any passengers in conversation. The officers were trained to watch for discrepancies in what was said, and to keep their eyes (and noses) open to "indicators" of possible drug involvement. Some drugs have noticeable odors, and the offi-

cers would be alert to the smell of the cars they stopped and to attempts to mask odors by air fresheners or other means. The officers also looked for signs of exceptionally hard travel, along with a variety of other factors mentioned in the record.

If they found nothing suspicious, the officers would either issue a citation for the traffic violation or let the driver off with a warning. When they suspected that a car might be carrying drugs, however, they would ask for permission to search the vehicle. If he agreed to a search, the driver would be asked to sign a consent form stating, among other things, that he could read, write, and understand the English language; that he understood that anything found in the search might be used against him in a court of law; that the consent was voluntary; and that "I have the right to refuse the search of my vehicle."

It was through the use of these techniques that the defendants in the instant case were caught carrying cocaine. Many of the events that led to their arrest were not disputed at the suppression hearing; where material disputes did exist, however, the magistrate credited the officers' version over the defendants'. The events in question may be summarized as follows.

Shortly before noon on Friday, January 5, 1990, Officer Lindsey Prebble, of the Lexington–Fayette Criminal Patrol Unit, was parked in an unmarked 1985 Plymouth police car observing northbound traffic on Interstate 75 in Fayette County, Kentucky. The posted speed limit was 55 miles per hour. Officer Prebble testified that he saw a black Chevrolet automobile passing other northbound traffic. The officer entered the highway and caught sight of the Chevrolet after it had broken through a group of slower vehicles. The officer then "paced" the Chevrolet from behind. The speedometer of the police car, which had been checked for accuracy the day before, indicated a speed of 62 miles per hour.[1] The officer activated his flasher and pulled the Chevrolet over.

The car had two occupants, both of whom were African–Americans and both of whom lived in Ohio. Their vehicle had Ohio license plates. Although the defendants suggest that the car would not have been stopped if its occupants had been white or if it had been registered in Kentucky, Officer Prebble testified that the speed of the vehicle was the sole reason for the stop. He stated under oath that neither the race of the occupants nor the out-of-state license plates had anything to do with it. He also testified that he had been taught at the Institute of Police Training and Management that drug couriers can be of any race, age, or sex, and can be driving any vehicle.[2]

Once the Chevrolet came to a stop at the edge of the highway, Officer Prebble parked his own vehicle behind it. The officer, who was in uniform, walked up to the driver's side of the Chevrolet. As he approached the car he noticed a blanket and pillow on the back seat. (Such articles can be significant, he testified, because they may indicate hard travel by people who do not wish to stop at hotels.) On the floor behind the driver Officer Prebble saw two travel guides; the guides were for Florida and Georgia.

The officer asked the driver, defendant Marks, for his operator's license. Mr.

---

**1.** Defendant Robert Dunson, who was a passenger in the Chevrolet, testified that defendant Marks, the driver, had slowed down to "about fifty-five, no more than sixty" miles per hour because of a signal from the radar detector with which the car was equipped. Defendant Marks testified that he had reduced his speed to the posted limit. The magistrate accepted Officer Prebble's testimony that the vehicle was exceeding the speed limit by seven miles per hour.

**2.** Officer John Blumenschein, who assisted Officer Prebble in the subsequent search and who had also been trained at the Institute, testified that he too had been taught that drug couriers can be of any race and that race should not be considered an indicator of drug involvement. A third officer trained at the Institute, Officer Richard Curtis, testified that although race was not paramount to him, he did think that race was one of the indicators to be looked at, as were out-of-state license plates. The record contains no indication that Officer Curtis played any part in the decision to stop the defendants or to request permission to search their car for drugs.

Marks produced it, and at the officer's request he stepped out of his car. The officer explained that the stop was for speeding, and he asked Marks where he had been. Marks did not say Florida or Georgia, as the travel guides might have suggested he would; his answer was "Kentucky." When asked if that was as far south as he had gone, Marks said that he had been in Tennessee for a couple of days. (The truth, as the defendants subsequently testified, was that they had borrowed the car from a friend in Ohio on January 2, 1990, and had driven further south than Tennessee before starting their return trip.)

The officer asked Mr. Marks to return to his seat because he wanted to speak with the passenger. The latter—defendant Dunson—got out of the car and had a brief conversation with the officer. Questioned as to where they had been, Dunson said that he and Marks had been in Tennessee for one day to visit relatives. "I asked him if he'd gone any farther south than Tennessee," according to the officer's testimony, and "he stated no."

Officer Prebble returned to his own car after the conversation with Mr. Dunson, taking Marks' driver's license with him. He radioed a request for a check on the license and a wanted-person check. He also requested backup assistance from Officer Blumenschein. A transcript of the radio traffic has Prebble saying this to Blumenschein: "If you would start down toward the 114 [mile post], I have one on the side[ ] I'm unsure about." Officer Prebble testified that he was unsure about the stories the men had told; he was troubled by the fact that one man said they had been in Tennessee for a couple of days while the other said they had been there one day, and by the fact that despite the

presence of Florida and Georgia travel guides, neither man admitted to having been south of Tennessee.

Officer Blumenschein responded promptly to the call for assistance, parking his police cruiser behind Officer Prebble's vehicle. The operator's license and wanted-person checks having disclosed nothing amiss, the two officers approached the driver's side of the Chevrolet. Officer Prebble had Mr. Marks get out of his car again, whereupon the officer returned his driver's license and told him that he would merely issue a warning, instead of a traffic citation, if Marks thought he could keep his speed down. Marks promised to do so. Officer Prebble testified that Mr. Marks would have been free to leave at this point, and the magistrate found that the officers said nothing to suggest to the defendants that they were not free to leave.[3]

Before Mr. Marks got back in his car, however, Officer Prebble told him that the police were looking for people running narcotics along the interstate. Mr. Marks denied that he was transporting any narcotics. Officer Prebble then asked if Marks would mind signing a consent to a search of the car, mentioning the Florida and Georgia travel guides as a reason for the request. Mr. Marks testified that Officer Prebble said the car could be towed if consent were withheld; the officer, however, denied making any such statement. The magistrate found as a fact that Officer Prebble did not tell Marks that his car would be towed if the consent form were not signed.

Shortly before the signing of the form, a third member of the criminal patrol unit, Officer Curtis, arrived on the scene in response to a request radioed by Officer Blumenschein. The transcript of the radio

---

**3.** Mr. Marks testified that he did not feel free to leave after receiving the warning. He explained that a third officer had arrived by this time, and Marks had never before had three cruisers pull up behind him for a speeding violation. The officers "looked like they had their hands on the gun," he testified, and were "looking mean." As a black man who had been on numerous civil rights marches in the south, he said, being in Kentucky with three police officers scared him.

He admitted that none of the officers made any reference to his being a black man, however, and the magistrate found—with ample support in the record—that no guns were drawn at any time and that "neither Marks nor Dunson [was] threatened or coerced during the short duration of the stop of their vehicle. Officer Prebble, who talked to both defendants, was very polite and accommodating to them."

traffic indicates that Blumenschein told Curtis "I think we got a good one to search here." Officer Blumenschein explained that it was standard operating procedure to request adequate assistance before conducting a search, "because it's dangerous...." Elsewhere in his testimony Officer Blumenschein explained that because the Chevrolet had two occupants, the officers wanted to use two men to conduct the search while one man watched the subjects. The record contains no indication that Officer Curtis engaged in any conversation with either Marks or Dunson.

Mr. Dunson, the passenger, was not asked whether he would agree to a search. Mr. Marks did agree, and he was handed the "consent-to-search" form described above. Mr. Marks testified that he did not really read the form, but glanced over it before he signed. Officer Prebble, on the other hand, testified that Mr. Marks appeared to read the form, trailing his pen along the lines of print as he did so. One line of the form stated "I have received the following formal education: _____." Mr. Marks, who had completed high school, filled in the blank with the number "12." The magistrate found, as noted above, that Marks signed the form voluntarily and intelligently and without duress or coercion.

Once the form had been signed, Officer Prebble opened the trunk of the car. In addition to a blue nylon duffel bag and several other pieces of luggage, the trunk contained grapefruit and pecans—products that Officer Prebble associated with Florida and Georgia. Upon opening the nylon duffel bag the officer found seven plastic-wrapped packages, each of which contained approximately one kilogram of what appeared to be cocaine. Marks and Dunson were placed under arrest at this point. It is uncontested that the substance in the packages was in fact cocaine.

## II

The criminal patrol unit of which Officer Prebble was a member used traffic violation stops—legitimate stops for real violations, as far as the record shows—as an "investigative tool" (the officer's term) for drug interdiction. Such a tool has an obvious potential for abuse. We are not persuaded that it was abused here.

Unlike the vehicle operated by the defendants in *United States v. Smith,* 799 F.2d 704 (11th Cir.1986), where the car was stopped because of what the court held to be an unreasonable suspicion that it was being used to transport drugs, the car occupied by Messrs. Marks and Dunson was stopped because Officer Prebble, who was stopping as many traffic violators as he could, saw it exceeding the speed limit. The defendants' very able counsel argues that "it is inconceivable that the defendants would speed in the presence of the police with one and a half million dollars worth of cocaine in their possession," but defendant Dunson did not find such speeding inconceivable. Dunson's own testimony suggests that the car could have been exceeding the speed limit by as much as five miles per hour. Both the magistrate and the district judge found as a fact that the defendants' car was speeding, and the judge found explicitly, as the magistrate did implicitly, that the defendants were stopped *because* they were speeding." (Emphasis supplied.) These findings are not clearly erroneous, and we are therefore bound by them. *United States v. Pino,* 855 F.2d 357 (6th Cir.1988), *amended by addition of special concurrence,* 866 F.2d 147 (6th Cir. 1989), *cert. denied,* ── U.S. ──, 110 S.Ct. 1160, 107 L.Ed.2d 1063 (1990).

A speeding violation having been committed in the presence of the officer, and the defendants not having shown that the officer was using questionable criteria in deciding which speeders to stop, we have no basis for holding that the traffic stop was constitutionally "unreasonable," or that it somehow interfered, as the defendants contend it did, with their rights under the First Amendment. Neither do we have any basis for holding that the Constitution prohibited Officer Prebble from asking the driver and his passenger to step out of the car once the stop had been effected, see *New York v. Class,* 475 U.S. 106, 115–16, 106 S.Ct. 960, 966–67, 89 L.Ed.2d 81 (1986), or that the Constitution prohibited the offi-

cer from attempting to engage them in conversation. See *Berkemer v. McCarty,* 468 U.S. 420, 435–42, 104 S.Ct. 3138, 3147–51, 82 L.Ed.2d 317 (1984); *Florida v. Bostick,* —— U.S. ——, ——–——, 111 S.Ct. 2382, 2387–88, 115 L.Ed.2d 389 (1991).

■ The defendants argue that Mr. Marks was "intimidated" and "coerced" into consenting to the search of his car, but the voluntariness of the consent is an issue of fact on which the trial court's finding represents the last word unless it is clearly erroneous. *United States v. Scott,* 578 F.2d 1186, 1189 (6th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978). Here the trial court found that the consent was voluntary, and this finding was not clearly erroneous.

Officer Prebble did nothing wrong in asking Mr. Marks if he would consent to a search of the car. See *United States v. Crotinger,* 928 F.2d 203 (6th Cir.1991). Although Marks was free to say no, he was also free to say yes. "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." *Bostick,* —— U.S. at ——, 111 S.Ct. at 2389.

The appropriate inquiry in these situations, *Bostick* reminds us, "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at ——, 111 S.Ct. at 2387. In the situation before us, given the factual findings that must control our decision, we think that a reasonable person would have felt free to decline Officer Prebble's request. The officer had already returned Mr. Marks' driver's license. The officer had issued a warning about speeding and had indicated that he was not going to give Mr. Marks a ticket. The police cars were parked behind Mr. Marks' vehicle and were not preventing it from being driven off. We must accept it as a fact that nobody threatened to tow Mr. Marks' car if he refused to let it be searched—and the form on which he signified his consent in writing told him in so many words that he had the right to refuse the search.

It is doubtless true that the presence of three officers in three separate police cars would be likely to have an unsettling effect on anyone in Mr. Marks' position who knew there was a large quantity of illegal drugs in the trunk of his car. Mr. Marks' guilty knowledge may have led him to consent to the search in the hope that the officers would content themselves with a cursory inspection of the car if he appeared cooperative. But such considerations can hardly invalidate a voluntary consent; "the 'reasonable person' test presupposes an *innocent* person." *Bostick,* —— U.S. at ——, 111 S.Ct. at 2388.

The situation in which Mr. Marks found himself was inherently less intimidating, in our view, than that of the defendant in *Bostick.* There two deputy sheriffs boarded a loaded bus that was scheduled to depart from a bus station. The sheriffs asked seated passengers, including the defendant, if they would consent to having their luggage searched. The bus passengers—unlike Mr. Marks—were in no position to leave. The Florida Supreme Court held that the sheriffs' practice of "working the buses" in this fashion was *per se* unconstitutional, but the Supreme Court of the United States rejected the Florida court's *per se* rule. The case was remanded for evaluation of the question whether, on the particular facts presented, a reasonable bus passenger would have felt free to decline the officers' request or otherwise terminate the encounter. In light of *Bostick,* we cannot say that the request made by Officer Prebble in the instant case was unconstitutional *per se*—and given the findings made by the trial court, we do not believe that Officer Prebble's request can be said to have been unconstitutional under the specific facts presented.

### III

■ We turn next to the question whether Mr. Marks' voluntary consent to the search was effective as to Mr. Dunson. Both men had participated in borrowing the car from its owner, and both of them had personal belongings in the trunk. The trial court found—correctly, we believe—that

both men had a legitimate expectation of privacy in the car and its contents. Although this means that Mr. Dunson had standing to contest the legality of the search, it does not mean that Marks' consent was ineffective as to Dunson.

In *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249–50 (1974), the Supreme Court expressed itself as follows:

"[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."

The "common authority" of which *Matlock* speaks can arise from

"mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* n. 7.

Defendant Dunson does not deny that he and Marks had "common authority" over the car and its contents. Accordingly, we find no error in the trial court's determination that the consent to the search was effective not only as to Marks, but as to Dunson as well.

## IV

Mr. Dunson had been convicted of a felony drug offense in 1989, and he was therefore subject to the mandatory minimum sentence provision in 21 U.S.C. § 841(b)(1)(A)(ii). That statute provides that "[i]f any person commits ... a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years

and not more than life imprisonment...." In sentencing Mr. Dunson to imprisonment for 20 years, the trial court imposed the lowest sentence allowed by the statute.

Mr. Dunson asks us to remand his case to let the district court consider whether the 20-year sentence represents cruel and unusual punishment. We decline to do so. The Supreme Court's recent decision in *Harmelin v. Michigan*, —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), eliminates any possible basis for supposing that Mr. Dunson's sentence violates the Eighth Amendment's prohibition against cruel and unusual punishments.

In *Harmelin*, where the defendant was convicted of simple possession of 672 grams of cocaine (an amount which is less than one-tenth the quantity involved here), the Supreme Court upheld the constitutionality of a mandatory life sentence without possibility of parole. Unlike Mr. Dunson, the defendant in *Harmelin* was not found to have possessed the cocaine with intent to distribute it to others. Unlike Mr. Dunson, the defendant in *Harmelin* had no prior felony convictions. If the life sentence imposed in *Harmelin* was constitutional, it follows *a fortiori* that Mr. Dunson's 20-year sentence is constitutional.

AFFIRMED.

WELLFORD, Senior Circuit Judge, concurring:

I concur with the opinion in this case, but feel compelled to reiterate my continuing hope that federal courts, like the Emperor in Gilbert and Sullivan's *The Mikado*, may fashion "punishment to fit the crime." Severe mandatory minimum sentences ofttimes frustrate that goal. *See, e.g., Harmelin v. Michigan*, —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).