Tze Poong LIU, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: May 25, 1993.
Decided: Aug. 17, 1993.

Gary A. Myers (argued), Deputy Atty. Gen., Dept. of Justice, Georgetown, for appellee.

Before VEASEY, C.J., MOORE and WALSH, JJ.

WALSH, Justice:

The appellant, Tze Poong Liu ("Liu"), appeals his conviction, following a jury trial in Superior Court, of six counts of Murder in the First Degree, and related charges of Arson, Burglary and Conspiracy. Liu advances several claims of error relating to the admissability of statements made to the police and the seizure of evidence from his apartment and a motor vehicle. Additionally, Liu claims that the use of interpreters denied him due process and a fair trial and that the jury was improperly instructed. Finally, he claims plain error in his convictions of multiple counts of conspiracy. The State concedes error in the multiple convictions of conspiracy, and we reverse and remand those convictions to the Superior Court for merger and resentencing. In all other respects, we affirm the convictions.

I

The facts of this case have been recited, in substantial part, in a related decision of this Court, upholding the convictions of Liu's co-conspirator. *Chao v. State*, Del. Supr., 604 A.2d 1351 (1992). We supplement that recital only to the extent necessary to supply a factual context for the issues on appeal.

In the early morning hours of March 9, 1988, three members of William Chen's ("Chen") family were killed in a fire that was deliberately set at his Claymont home. Chen, awakened by smoke and noise, observed the figure of a female intruder in his living room among the first floor smoke. Flames flashed through the house and forced Chen outside. His wife, daughter and mother perished in the fire. Their remains were later found in the upstairs bedrooms.

Deputy state fire marshals commenced an investigation of the blaze within an hour

Joseph A. Gabay (argued), Wilmington, for appellant.

after it was reported. The investigation revealed that gasoline had been poured in three separate areas of the house: (i) in the garage below Chen's bedroom; (ii) around a back door; and (iii) throughout the first floor living area. It was concluded that the fire was started in each of the three areas and that the rear entrance was the principal ignition point. It also appears that the strategic placement of the gasoline denied the occupants of the house a route of escape.

Investigators interviewed Chen on the day of the fire and he informed police that he had been involved in a turbulent romantic relationship with a woman from New York City named Vicky Chao ("Chao"). Chen recounted an incident in which Chao had him arrested for assault approximately one month prior to the fire. He also indicated that Chao appeared at his Claymont home nine days before the fire and became embroiled in an argument with both his wife and mother. At that time she threatened to cause Chen "big trouble." Chen also advised investigators that at one point Chao provided Chen with four thousand dollars so that he could start his own business, but the relationship soured when Chen traveled to Shanghai to marry his now deceased wife.

Armed with the information obtained in their interviews with Chen, investigators immediately traveled to New York City to question Chao. Accompanied by New York City police officers, the contingent arrived at Chao's apartment at approximately 1:45 a.m. on March 10. Chao cooperated with the officers and accompanied them to a local police station for questioning.

During a taped interview, Chao implicated Liu, a New York City taxicab driver and acquaintance, as the arsonist. She claimed that Liu wanted to kill Chen and that he forced her to accompany him to Delaware the previous night in his taxicab. She also stated that Liu stopped to fill a plastic container with gasoline during the trip to Delaware. Chao claimed that when they arrived at Chen's home she was terrified and waited in the taxicab after Liu exited it

because he had threatened her. She further stated that when Liu returned to the car, his hand was bleeding and he exclaimed that he had set fire to the house. Eager to further the investigation and follow up on the information Chao provided, the Delaware authorities promptly ended the questioning and hastened to find Liu.

The Delaware authorities and a New York City detective went to Liu's apartment. Upon arriving at the apartment, the detective identified the officers and explained that they were investigating an incident that occurred in Delaware. Liu invited the officers into his apartment. Inside, one of the Delaware officers advised Liu of his *Miranda*[1] rights by reading the five warnings from a written form. The officer asked Liu whether he understood each warning after it was recited. On each occasion Liu indicated that he understood the warning by affirmatively nodding his head. The officer then asked Liu if he would answer their questions. Liu agreed to speak to the officers and executed a waiver form by signing the form and checking an appropriate box. The officer also presented Liu with a consent to search form and asked if the police could search the apartment. The officer read the form to Liu and explained that he did not have to consent to the search. A search was conducted after Liu voluntarily signed the form. Clothing and other personal items were seized in the search. Afterwards, Liu was taken to the police station for questioning.

When Liu arrived at the police station, he was read his *Miranda* rights a second time. The police also had him execute another waiver form before he answered any questions. Liu was then interrogated by the police. Although he admitted to knowing both Chao and Chen, he denied ever having been to Delaware. Liu explained that the cuts on his hands occurred while he was filling his taxicab with gasoline. The police then confronted him with the claim he had been in Delaware on March 1 and on the day of the fire. At that point, Liu ended

**1.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the interview by stating that he did not want to answer any more questions and requesting an attorney.

The following day, the police searched Liu's taxicab without obtaining his consent or a search warrant. Although Liu did not own the cab, he and another person leased it from an individual named Ari Vaza ("Vaza") on a weekly basis. Each drove the taxicab twelve hours per day and left the vehicle at a pre-determined location for the other driver. Every Saturday, Vaza would meet Liu and the other lessee at a garage to collect the weekly rental payment and to inspect the taxicab. The day after Liu was arrested the police contacted Vaza and asked him to bring the taxicab to the 115th police station so they could inspect it. Vaza complied and, with Vaza's permission, the police searched the taxicab and seized several items from the passenger compartment and trunk.

Prior to trial, Liu moved to suppress testimonial and physical evidence the police obtained from him, his apartment and the taxicab. Although Liu did not allege police misconduct, he claimed that his inability effectively to understand or to communicate in English combined with his cultural background precluded a knowing waiver of his constitutional rights. The trial judge denied the suppression motion after hearing expert testimony regarding Liu's lack of proficiency in the English language and the adverse effect his Chinese upbringing could have had on his ability to waive his rights.

Liu and Chao were both arrested and indicted on six counts of Murder in the First Degree and related conspiracy and arson charges. These trials were severed and the State elected to prosecute Chao first. She was convicted of all charges and her convictions were affirmed on appeal. *Chao v. State*, Del.Supr., 604 A.2d 1351.

## II

■ Liu's initial claim of error is directed to the trial court's refusal to suppress statements Liu made to the police while being interrogated, evidence the police seized from Liu's apartment and evidence the police seized from his taxicab. This Court reviews the trial court's refusal to grant a motion to suppress, after an evidentiary hearing, under an abuse of discretion standard. *Alston v. State*, Del.Supr., 554 A.2d 304, 308 (1989); *Gregory v. State*, Del.Supr., 616 A.2d 1198, 1200 (1992). "The essence of judicial discretion is the exercise of judgment directed by conscience and reason, as opposed to capriciousness or arbitrary action...." *Pitts v. White*, Del.Supr., 109 A.2d 786, 788 (1954).

### A.

■ Liu claims that the trial court erred in failing to suppress various statements he made to the police during custodial interrogation on the ground that the two *Miranda* waivers he executed were not valid. A defendant may waive the rights conveyed in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 10 L.Ed.2d 694 (1966).

An effective *Miranda* waiver must satisfy a two-pronged test.

> First, the relinquishment of the right[s] must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

■ The "voluntariness" inquiry is limited to whether the waiver was a result of "police overreaching." *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986). "The sole concern of the Fifth Amendment ... is govern-

mental coercion." *Id.* Absent a finding of coercive government misconduct, a waiver of one's *Miranda* rights cannot be considered involuntary. Liu advances no assertion of police misconduct but claims that his limited understanding of English and his cultural upbringing prevented him from knowingly, intelligently and voluntarily waiving his constitutional rights, even in the absence of police overreaching. Notwithstanding the absence of the necessary assertion of police misconduct, we find no merit to this claim.

In the suppression hearing the trial judge was presented with an expert evaluation of Liu's command of the English language. Dr. Scott Stevens ("Stevens"), a linguistics expert from the University of Delaware, examined Liu and tested his language proficiency. Stevens reported that Liu scored poorly on a battery of tests designed to measure his ability to understand English in both its written and spoken form. Nevertheless, after examining the *Miranda* waiver forms the police use, Stevens concluded that Liu was probably able to understand the waivers he executed. Dr. Stevens explained:

> I think [Liu] probably could have understood [the form]. The sentences are short. They are straightforward declarative sentences.
>
> The vocabulary is what we would call high-frequency vocabulary, for the most part. There are also no difficult or seldom-used words here. And also, its presented, as opposed to paragraph form, straight—individual sentences spaced apart. And you can probably, with—I imagine if he read it and also had it read to him, that double input would make it easier for him to understand.
>
> . . . .
>
> I can't know for certain, but I'd say there's a good chance [he understood the *Miranda* waiver form].

Liu's conduct during questioning corroborates the expert's findings. When the police confronted Liu with the assertion that he had been in Delaware on the day of the fire and on March 1, Liu ended the interview by exercising his constitutional rights. He stated that he did not want to answer further questions and requested an attorney. Liu's reaction strongly supports the inference that he fully understood and was able to exercise his *Miranda* rights. The trial judge did not abuse his discretion in so ruling.

 Liu next claims that his Chinese heritage, reflecting a culture which traditionally demands unquestioning cooperation with authority figures, inclined him to surrender instinctively his *Miranda* rights. He was thus predisposed, it is argued, not to invoke rights which are constitutionally guaranteed and his relinquishment of such a right was not complete and knowing.

The extent to which an individual's cultural heritage should be considered in gauging whether there has been an effective waiver of constitutional rights is a matter of first impression in this State. The issue implicates serious concerns of fairness in the administration of criminal justice. On the one hand, our system of criminal justice is based upon the fundamental principle that effective law enforcement cannot depend on "the citizens' abdication through unawareness of their constitutional rights." *Escobedo v. Illinois,* 378 U.S. 478, 490, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977 (1964). Those rights, now firmly established in our jurisprudence, may be relinquished only through a knowing, intelligent and voluntary waiver. *Miranda v. Arizona,* 384 U.S. at 492, 86 S.Ct. at 1637; *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. at 1141.

Cultural heritage clearly has some impact upon an individual's full awareness of his or her rights and necessarily assumes a role in the "totality of the circumstances" analysis enunciated in *Moran v. Burbine.* Such concerns notwithstanding, constitutional rights cannot be construed so broadly as to place unreasonable burdens on law enforcement officials. The United States Supreme Court has noted that police officers must not be forced to "anticipat[e] the frailties or idiosyncracies of every person whom they question." *Berkemer v.*

*McCarty,* 468 U.S. 420, 442 n. 35, 104 S.Ct. 3138, 3151 n. 35, 82 L.Ed.2d 317 (1984) (quoting *People v. P.,* 21 N.Y.2d 1, 286 N.Y.S.2d 225, 232, 233 N.E.2d 255, 260 (1967)).

The cultural heritage issue was squarely addressed in *United States v. Yunis,* D.C.Cir., 859 F.2d 953 (1988). There, a trial judge in granting a motion to suppress a statement ruled that a Lebanese national arrested in international waters and fully advised of his *Miranda* rights could not be expected to have understood the nature of his rights without a comprehension of the American justice system. On appeal, the Court of Appeals explained that an objective standard which takes the education, experience and conduct of the accused into account is used to evaluate the validity of a constitutional waiver. *United States v. Yunis,* 859 F.2d at 965. Consistent with this standard, the court held that a defendant's "alienage and unfamiliarity with the American legal system should be included among [the] objective factors" used to determine whether a defendant understands the "plain meaning" of the rights being relinquished. *United States v. Yunis,* 859 F.2d at 964–965. The court, however, also noted that "[t]he fact that a defendant's alien status may have prevented him from understanding the full, tactical significance of his decision to [waive certain rights] will not invalidate his waiver." *Id.* at 965. Assessing the totality of the circumstances, the Court of Appeals reversed the decision of the trial court, holding that the defendant validly relinquished his constitutional rights. *See also State v. Rivera,* 152 Ariz. 507, 733 P.2d 1090, 1096 (1987) (court considered Mexican national's familiarity with U.S. criminal process in determining whether defendant knowingly waived his *Miranda* rights); and *Peterson v. State,* Alaska Supr., 562 P.2d 1350, 1363 (1977) (court considered defendant's lack of experience outside Alaska's bush country in determining whether defendant knowingly waived his *Miranda* rights).

In a similar vein, the United States Supreme Court has established a broad test for determining whether an individual knowingly relinquishes a constitutional right. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that [constitutional] rights have been waived." *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. at 1141. An individual's cultural heritage is certainly one of the many circumstances, including education and experience, which may shape awareness of one's constitutional rights. But the standard is an objective one which tests the level of comprehension of the plain meaning of the rights involved. Such a standard will safeguard an accused's constitutional rights without forcing police officers to "anticipat[e] the frailties or idiosyncracies of every person whom they question." *Berkemer v. McCarty,* 468 U.S. at 442 n. 35, 104 S.Ct. at 3151 n. 35.

At Liu's suppression hearing cultural experts indicated it is extremely unlikely that a native Chinese would understand that he could refuse to submit to official police requests. One defense expert testified that he thought "the [Chinese] socialization process would lead one to follow whatever—instructions—a law officer would require." Additional evidence presented at the hearing, however, indicates that Liu has lived and worked in New York City for several years. During that time, he obtained a taxicab license, conducted business and participated in a small claims court proceeding. The record supports the inference that Liu had been exposed to the American socialization process for many years prior to his arrest. Liu's decision to stop answering questions during the interrogation in a police dominated setting and his request for an attorney are strong evidence that he understood his constitutional rights and that his actions were not unduly constrained by his Chinese heritage. *See U.S. v. Yong Bing–Gong,* N.D.N.Y., 594 F.Supp. 248 (1984).

In the present case, the totality of the circumstances strongly suggest that Liu's initial decision to waive his rights was not compelled by his Chinese heritage and

there is no claim of misconduct. Accordingly, we conclude that the trial judge did not abuse his discretion in denying the motion to suppress statements made to police during custodial interrogation.

### B.

Liu also claims that the trial court erred in failing to suppress evidence the police seized from his apartment on the ground that his consent to the search was invalid. His claim is premised on the same contention advanced with respect to the *Miranda* waiver—his lack of understanding of the process.

The standard for evaluating a person's consent to a warrantless search under the Fourth Amendment is whether "the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). "Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Id.* at 248–249, 93 S.Ct. at 2059. The record indicates that after the police advised Liu of his *Miranda* rights, the officers presented him with a search consent form. At the suppression hearing, Detective Forbes testified that he sat at a table with Liu and first asked him whether he would mind if the police searched his apartment. The detective next explained that the consent to search form would give the officers permission to search the apartment. In response Liu stated, "Okay." Forbes then read the document to Liu and carefully explained that he did not have to let the officers search the apartment. Liu, however, consented to the search and signed the form. A linguistic expert testified that Liu likely had greater difficulty understanding the consent to search form than the *Miranda* waiver form due to its increased complexity. Nevertheless, the trial judge ruled that

the police reasonably concluded Liu consented to the search.

As noted earlier, Liu lived and worked in New York City for several years prior to his arrest, obtained a taxicab license, conducted business and participated in a small claims court proceeding. An expert testified that, although Liu scored poorly on a battery of tests designed to measure his ability to communicate in English, he was able to understand "high-frequency" vocabulary. The expert further testified that if Liu read English and also had it read to him, the double input would aid his understanding. In the present case, Detective Forbes verbally explained the form to Liu prior to having him read and execute it. Liu's outward expressions and behavior apparently gave the impression that he understood the officer's explanation. Liu's extensive exposure to various aspects of American society and the manner in which he interacted with the police support a finding that Liu validly consented to the search. If, as is claimed, the police reasonably perceived it as such, the police were justified in proceeding with the search of the apartment. The trial judge did not abuse his discretion in ruling to that effect.

### C.

Finally, Liu claims that the trial court erred by failing to suppress evidence the police seized from his taxicab on the ground that he had a reasonable expectation of privacy in the taxicab which the State was not free to infringe without a warrant or his consent. Since it is conceded that the police did not secure Liu's consent prior to the search of the taxicab, the resolution of this issue requires an examination of the nature and extent of Liu's privacy expectation.

In *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), a case involving a warrantless search of a defendant's home, the United States Supreme Court held:

> when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but

may show that permission to search was obtained from a third party who possessed **common authority** over **or other sufficient relationship to the premises** or effects sought to be inspected.

*Id.* at 171, 94 S.Ct. at 993 (emphasis added).

The Court further explained that common authority can arise from:

mutual use of the property by persons generally having **joint access or control for most purposes,** so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the **risk that one of their number might permit the common area to be searched.**

*Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7 (emphasis added). *See also Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not).

Although the foregoing analysis pertains to dwellings, it may validly extend to automobile searches as well. In *United States v. Beshore,* 8th Cir., 961 F.2d 1380 (1992), for example, it was held that a girlfriend who had permission to use her boyfriend's car was able to consent to a search of the vehicle because she had common authority over the car. Citing *United States v. Matlock,* the court explained that the owner of the car assumed the risk that his girlfriend would permit the vehicle to be searched by allowing her to borrow it. *Id.* at 1382. Similarly, in *United States v. Dunson,* 6th Cir., 940 F.2d 989 (1991), it was ruled that when two men borrow an automobile from its owner and each has personal belongings in the trunk, both men possess common authority over the vehicle. Accordingly, it was held that the driver's consent to a search of the vehicle was also effective as to the passenger. *Id.* at 995. In *United States v. Morales,* 3rd Cir., 861 F.2d 396 (1988), the consent to search a rented automobile was deemed valid even when it is given by the driver of the vehicle rather than the actual lessee. The court further held that the consent extended to a hidden, but accessible, area in the rear passenger compartment of the vehicle. *Id.* at 400–401. *See also United States v. Anderson,* 3rd Cir., 859 F.2d 1171 (1988) (driver's consent to search automobile in which neither he nor passenger had an ownership interest was applicable to passenger; driver had at least common authority over trunk of car and could consent to search of passenger's property in the trunk); and *United States v. Koehler,* 5th Cir., 790 F.2d 1256 (1986) (defendant's wife had common authority over car so that her voluntary consent rendered search constitutional).

In the present case, the police obtained consent to search the taxicab from its owner, Ari Vaza, who leased the taxicab to Liu and another person on a weekly basis. Each lessee drove the taxicab for twelve hours a day. At the end of each twelve hour shift, the driver would leave the taxicab at a pre-determined location so that the other lessee could use the taxicab for the next twelve hour shift. As between the lessee-drivers, there was clearly no expectation of privacy or control during the period of the other's use. As the owner, Vaza retained a high degree of control over the vehicle. He held the taxicab medallion, the official operating permit. Every Saturday, he would meet both lessees at a garage where he collected the weekly rental payment and inspected the taxicab.

The parties to the lease agreement clearly had joint access to the cab. Although Vaza's right to use the vehicle was limited by the existence of the lease, it appears that he had liberal access to the cab and retained substantial control over the vehicle. Indeed, he was able to bring the vehicle to the police soon after they contacted him about searching it. Vaza's general authority over the vehicle was at least equal to that of the lessees and he exercised such "other sufficient relationship" to the taxicab as to render his consent valid under *United States v. Matlock.* Each party to the taxicab lease agreement assumed the risk that one of their number might permit the common area to be

searched at a time when the vehicle was not in his physical custody. We find no error in the denial of the motion to suppress items recovered from the taxicab.

## III

██ We next address an issue which also arose in the trial of Liu's co-defendant Vicky Chao—the accuracy of interpreted testimony. Although Chinese language interpreters were employed throughout the trial and the suppression hearings, dialect differences created a lack of precision. In particular, Liu contends that interpreters failed to provide accurate translations of portions of Chen's testimony which were highly incriminating.

"The use and the qualifications of an interpreter are matters for the consideration of the trial judge in his discretion. The propriety of his action is to be weighed in the light of all the relevant circumstances, and will not be interfered with unless injustice to the defendant clearly appears." *Green v. State*, Del.Supr., 260 A.2d 706, 707 (1969). "The essence of judicial discretion is the exercise of judgment directed by conscience and reason, as opposed to capriciousness or arbitrary action...." *Pitts v. White*, Del.Supr., 109 A.2d 786, 788 (1954).

Questions concerning the accuracy of the interpreter's translations in this case were first raised by the *prosecution* after three days of testimony had been heard. The State initially learned that there might be a problem with the translator when an anonymous, Asian spectator approached the prosecutor and commented that the translator was doing a poor job. Other incidents exacerbated this concern. On occasion, the two translators involved in the trial disagreed as to the proper translation of questions and testimony. During cross-examination, Chen occasionally answered defense counsel's questions in English. When asked why he had responded in English, Chen explained that "he thought he spoke better English than the translator did and the translator was not able to express his ideas clearly." Defense counsel also expressed concern regarding the accuracy of

Chen's translation but advised the court that he was not seeking a mistrial. When the State later suggested that Chen's testimony be stricken and that he be reexamined, defense counsel expressed an interest in merely substituting interpreters since counsel believed that the substance and meaning of Chen's testimony was being translated to the jury.

Despite defense counsel's repeated representations regarding the accuracy and acceptability of the translations, he eventually moved for a mistrial on the basis of the translations. Defense counsel argued:

> Quite frankly, I'm appalled that I have to stand here and do this, but I'm going to ask for a mistrial for Mr. Liu and I'm going to ask for a dismissal of all of the charges on the basis that we can't get translations which properly go between the bounds of cultural differences sufficient to allow the defense counsel to effectively cross-examine effectively on cross-examination, whereby he then doesn't have to get up and argue about the meaning and translation and interpretation and substance, etc., to a jury, when a man's life is on the line.
>
> I quite frankly don't think that is appropriate. And I don't think it is fair to Mr. Liu. I think it is exceptionally unfair to any defendant, let alone Mr. Liu, and if we have these cultural bounds, that is apparently something that cannot be overcome and denies the defendant a fair trial under the circumstances.

Defense counsel did not object to the accuracy of the translations *per se*. Rather, as the State correctly observes, the motions for mistrial and dismissal were based upon the premise that the cultural differences which existed were insurmountable obstacles that rendered effective cross-examination impossible under any circumstances. In effect, the defense objection impugned the very use of translators in the trial process. Liu's motion was denied by the trial court and is now raised on appeal.

In *Chao v. State*, this Court, in addressing the problem of interpreter testimony,

employed a four-prong test to determine when an official interpreter is required to safeguard a defendant's right to due process. This Court held that a defendant is denied due process when:

(1) what is told him is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the proceeding is not explained to him in a manner designed to insure his full comprehension; or (4) a credible claim of incapacity to understand due to language difficulty is made and the district court fails to review the evidence and make appropriate findings of fact.

*Chao v. State*, 604 A.2d at 1362 (quoting *United States v. Cirrincione*, 7th Cir., 780 F.2d 620, 634 (1985)). Although this test traditionally has been applied to instances in which a defendant has difficulty with the language, its rationale is equally applicable to a situation involving a material witness who has difficulty communicating in English. The inability of a material witness to understand questions and communicate in English poses the same risk of denial of due process as may occur if the defendant labors under a language handicap.

In the present case, it does not appear that Chen or the interpreters jeopardized Liu's right to due process. The record indicates that Chen understood much of what he was asked. He occasionally answered questions in English without the aid of an interpreter because he thought he could express his ideas more clearly than the translator. An examination of the record supports the trial judge's ruling that, although the translators were not translating Chen's testimony word for word, they were accurately conveying the substance and meaning of the witness' testimony to the jury. We find no basis for concluding that the accuracy of the translation is "subject to grave doubt." *United States v. Cirrincione*, 780 F.2d at 634. A credible claim of incapacity to understand has not been established in this case. Since Liu

has suffered no undue prejudice from the translations, he was not denied a fair trial.

## IV

Liu next asserts that he cannot be convicted of both felony murder and intentional murder for each homicide because arson was the instrumentality of death. He further argues that the murders were neither part of the arson nor committed in furtherance of the arson. This claim is without merit.

As Liu concedes, this issue was thoroughly addressed by this Court in the related case of *Chao v. State*, Del.Supr., 604 A.2d 1351, 1360–1361 and 1362–1363 (1992). Under the same factual circumstances, this Court expressly held that "felony murder and intentional murder are not the same offense, and, thus, a criminal defendant permissibly may be charged and convicted of both crimes for the death of a single person." *Id.* at 1361 (emphasis in original). That ruling is dispositive here.

## V

Although Liu and Vicky Chao were indicted jointly on various counts of murder, arson, burglary and conspiracy, their cases were severed for trial. Nevertheless, at Liu's trial, the State's theory of criminal liability was that Liu, in addition to his responsibility as a principal for his direct participation, was also guilty as an accomplice for the actions of Chao.[2] Various scenarios developed at trial supported alternative theories as to whether one or both defendants entered the Chen house, but that the planning and preparation for the fire was a joint effort. Hence, the jury was instructed that, although Liu's mere presence at the scene of the crime would not support a guilty finding, he could be found guilty of "offenses committed by another person." The jury was further instructed that its verdict "need not be unanimous as to a specific theory of liability as a principal or as an accomplice so

---

2. Under Delaware law, a person indicted as a principal may be convicted as an accomplice to the other person who commits the offense charged. Conversely, one indicted as an accomplice may be convicted as a principal. 11 *Del.C.* § 275.

long as you are in general agreement as to his guilt."

At trial, Liu's counsel objected to the principal-accomplice instruction on the ground that accomplice liability may not form the basis for imposition of the death penalty. On appeal, Liu pursues his objection to the principal-accomplice instruction but on a different ground—that its potential for jury confusion run afoul of this Court's decision in *Probst v. State*, Del. Supr., 547 A.2d 114 (1988). The State correctly notes Liu's objection at trial was based on Eighth Amendment grounds, not jury confusion, and to that extent the claim has not been preserved for appeal. Supr. Ct.R. 8. Nonetheless, in view of the importance of the question, we will consider this matter under a plain error standard of review. *Wainwright v. State*, Del.Supr., 504 A.2d 1096, 1100 (1986).

Although a defendant has no right to a jury instruction in a particular form or in requested language, he is entitled to have the jury instructed with a correct statement of the substantive law. *Claudio v. State*, Del.Supr., 585 A.2d 1278, 1282 (1991). Thus, we must determine whether the instructions given to the jury were erroneous as a matter of law. *Culver v. Bennett*, Del.Supr., 588 A.2d 1094, 1096 (1991).

In *Probst v. State*, this Court held that "[i]n the routine case, a general unanimity instruction is sufficient to insure that the jury is unanimous on the factual basis for a conviction." *Probst v. State*, 547 A.2d at 120. "However, this rule is inapplicable where there are factors in a case which create the potential that the jury will be confused." *Id.* (citing *United States v. Beros*, 3rd Cir., 833 F.2d 455, 460 (1987)). Specifically, we held that "[w]hen the State chooses to prosecute under alternative or multiple theories, it must prove at least one of the theories beyond a reasonable doubt to the satisfaction of the entire jury." *Id.* at 121.

On Motion for Rehearing *En Banc*, we held that "a specific unanimity instruction

is [not] required in every case where a defendant may be convicted as a principal or as an accomplice." *Id.* at 122 (emphasis in original). We cautioned, however, that "when **one count** encompasses **two separate incidents,** the trial judge must instruct the jury that if a guilty verdict is returned, the jurors must be unanimous as to which **incident** they find the defendant guilty." *Id.* at 122 (emphasis in original).

Under the *Probst* standard, no specific unanimity instruction was required in this case. This is not a situation where "**one count** encompasses **two separate incidents.**" *Id.* at 122. Rather, this is a case involving two people and a single incident where the State may have difficulty proving their respective roles. In such a case, a general unanimity instruction serves to prevent both persons from escaping criminal responsibility, where there is compelling evidence that they jointly planned and carried out the criminal enterprise. There are no circumstances in this case creating a potential for confusion as to whether Liu and Chao's efforts were directed to an incident other than the burning of the Chen residence with the intended consequences. Thus, the instructions given to the jury were not erroneous as a matter of law.

The State urges this Court to disavow the "unanimity" requirement of its panel opinion in *Probst v. State*, 547 A.2d at 120–122. The State claims that our position that "[t]he Sixth Amendment to the United States Constitution requires that there be a conviction by a jury that is unanimous as to defendant's specific illegal action," *Id.* at 121, is no longer an appropriate summation of federal constitutional principles. *Schad v. Arizona*, 501 U.S. ——, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion). In addition, the State claims that the case law foundation for the panel opinion no longer stands.[3] We disagree.

In *Schad v. Arizona*, a plurality of the United States Supreme Court held that when jurors are faced with several statutory alternatives, due process does not re-

---

3. *United States v. Beros*, 3rd Cir., 833 F.2d 455 (1987) and *United States v. Gipson*, 5th Cir., 553

F.2d 453 (1977). *See Probst v. State*, 547 A.2d at 120 n. 8.

quire that they be unanimous as to the specific means used to commit the crime or the exact mental state of the defendant. *Id.,* —— U.S. at ——, 111 S.Ct. at 2497.[4] The Court also held that unanimity is necessary if the alternatives before the jury are so different that, as a matter of history and fairness, they cannot be viewed as similar means to the same end. *Id.,* —— U.S. at ——, 111 S.Ct. at 2503–2504. In so holding, the Court specifically rejected the "distinct conceptual groupings" approach, adopted in *United States v. Gipson,* 553 F.2d at 456–459, as the sole criterion for determining whether unanimity is required. *Schad v. Arizona,* —— U.S. at ——, 111 S.Ct. at 2498.

There is no reason for this Court to disavow the "unanimity" element in the panel opinion in *Probst.* We have never adopted the "distinct conceptual groupings" approach as the sole criterion for determining whether unanimity is required. *Probst v. State,* 547 A.2d at 120–121. To the extent that this Court relied upon *United States v. Gipson,* it was for the proposition that "[t]he unanimity rule ... requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged," *Probst v. State,* 547 A.2d at 121 (quoting *United States v. Gipson,* 553 F.2d at 457–458), a proposition that is undisturbed by the plurality opinion in *Schad v. Arizona.* As the Court noted in *Schad:*

> Just as the requisite specificity of the charge may not be compromised by the joining of separate offenses, nothing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of "Crime" so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or

littering, for example, would suffice for conviction.

*Id.* at ——, 111 S.Ct. at 2497–2498 (citation and footnote omitted).

We affirm *Probst v. State,* in its entirety, as a valid summation of federal, as well as Delaware, constitutional principles.

## VI

 Liu claims for the first time on appeal that the trial court erred in instructing the jury on the issue of the voluntariness of his statements to the police. At oral argument, Liu's counsel conceded that this claim was without merit. The standard and scope of review is whether the trial court committed plain error in instructing the jury. Supr.Ct.R. 8; *Culver v. Bennett,* 588 A.2d at 1096.

Liu contends that the trial court erred in instructing the jury that the State was required to prove the voluntariness of his statements by a higher standard than a preponderance of the evidence, in view of his difficulty in English comprehension. Liu, however, was not entitled to any jury instruction on the issue of voluntariness. The trial judge is the sole arbiter of the admissibility of the defendant's statements. *Flamer v. State,* Del.Supr., 490 A.2d 104, 116 n. 7 (1983), *cert. denied,* 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983) and 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985). There is no threshold determination of voluntariness for the jurors; their role is simply to determine the reliability or credibility of the statement. *Harris v. State,* Del.Supr., 622 A.2d 1095 (Feb. 3, 1993) (ORDER). "Accordingly, no specific instruction on voluntariness is required." *Id.* Hence, there was no plain error here.

## VII

 Liu's final claim of error is conceded by the State. Liu was found guilty

---

4. We agree with the United States Supreme Court's holding that the right to jury unanimity is "more accurately characterized as a due process right [rather] than as one under the Sixth Amendment." *Schad v. Arizona,* —— U.S. at —— n. 5, 111 S.Ct. at 2498 n. 5. We also agree, however, that whether it is characterized as a due process right or a Sixth amendment right

"is immaterial to the problem of how to go about deciding what level of verdict specificity is constitutionally necessary." *Id.* Regardless of federal constitutional standards, jury unanimity is required by Article I, Section 4 of the Delaware Constitution and Superior Court Criminal Rule 31(a). *See Fountain v. State,* Del.Supr., 275 A.2d 251 (1971).

of three counts of conspiracy for conspiring with Chao to commit intentional murder, felony murder and arson. Although he did not object before sentencing, Liu now claims that these convictions are in violation of 11 *Del.C.* § 521(a). The standard and scope of review is whether the multiple convictions are plainly erroneous.

11 *Del.C.* § 521(a) provides:

If a person conspires to commit a number of crimes, he is guilty of only 1 conspiracy, so long as the multiple crimes are the object of the same agreement of continuous conspiratorial relationship. He may be convicted of the degree of conspiracy which includes the most serious offense which he is found guilty of conspiring to commit.

The State concedes that it was plain error to convict Liu of three counts of conspiracy since the multiple crimes of intentional murder, felony murder and arson were "the object of the same agreement of continuous conspiratorial relationship." *Id.* We agree. Accordingly, we reverse Liu's multiple conspiracy convictions and remand them to Superior Court for merger into one charge of conspiracy. An appropriate resentencing is also required.

The judgment of the Superior Court is REVERSED and REMANDED in part for the purpose of merging the three conspiracy charges against Liu into one charge of conspiracy and for resentencing. In all other respects, the judgment is AFFIRMED.